CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF BONNER & BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

KARAN K. GILL, ESQ. SB# 288782
**LAW OFFICES OF KARAN K. GILL**
1990 NORTH CALIFORNIA BLVD., 8TH FLOOR
WALNUT CREEK, CA 94596
TEL: 510.629.0533
FAX: 510-281-0640
karan@kkglawoffices.com

ATTORNEYS FOR PLAINTIFFS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT E. BROCK JR.; AMANDA BO DENTON; JEFFERY LAO; KAMAL DAYEKH; WILSON WOO; CHRISTOPHER MONTOYA; FRANCISCO UBALDO; and other Similarly Situated Employees; TERESA M. BROCK; WISSAM HALHOUL; and DOES 1-200,<br><br>        Plaintiffs,<br><br>    vs.<br><br>CONCORD AUTOMOBILE DEALERSHIP LLC DBA: LEXUS OF CONCORD LLC; TOYOTA MOTOR SALES U.S.A, INC; HANK TORIAN; PATRICK MILIANO; GREG JAMES; and ROES 1-200,<br><br>        Defendants. | Case No.:<br><br>1. FEDERAL FAIR STANDARD LABOR ACT: FAILURE TO KEEP ACCURATE WAGE RECORDS.<br>2. CALIFORNIA LABOR CODE 1102 VIOLATIONS<br>3. WRONGFUL TERMINATION<br>4. RETALIATION AND VIOLATION PUBLIC POLICY/TAMENY<br>5. FRAUD<br>6. ASSAULT<br>7. WORKPLACE VIOLENCE/THREAT OF VIOLENCE<br>8. HOSTILE WORK ENVIRONMENT VIOLATION TITLE 7 AND FEHA<br>9. DISCRIMINATION TITLE 7 & FEHA<br>10. DISCRIMINATION, FAILURE TO PROTECT FROM DISCRIMINATION- VIOLATION OF TITLE 7 AND FEHA<br>11. CONVERSION<br>12. EMBEZZLEMENT |

1
COMPLAINT

13. PREMISE LIABILITY
14. BREACH OF IMPLIED CONTRACT
15. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
16. VIOLATION OF CONSTRUCTIVE TRUST/FIDUCIARY DUTY
17. NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING
18. IIED
19. BUSINESS & PROFESSIONS CODE 17200, Et Seq.
20. CONSPIRACY
21. LABOR CODE §201, §221, §223, §226, §218.5
22. CONSTRUCTIVE DISCHARGE
23. LOSS OF CONSORTIUM
24. INJUNCTIVE RELIEF

**JURY TRIAL DEMANDED**

## **INTRODUCTION**

PLAINTIFFS, by their attorneys, CHARLES A. BONNER of the LAW OFFICES OF BONNER & BONNER, and KARAN K. GILL of the LAW OFFICES OF KARAN K. GILL as and for their Complaint, respectfully allege, on behalf of themselves and others similarly situated,  upon information and belief, as follows:

At all relevant times, PLAINTIFFS and DOES 1-200 were employees of DEFENDANTS or spouses of PLAINTIFFS, and all are citizens of this Judicial District.

1.     PLAINTIFFS ROBERT E. BROCK JR. (hereinafter "Mr. Brock"), AMANDA BO DENTON (hereinafter "Ms. Denton"), JEFFERY LAO (hereinafter "Mr. Lao"), KAMAL DAYEKH (hereinafter Mr. "Dayekh"), CHRISTOPHER MONTOYA (hereinafter Mr. Montoya), WILSON WOO (hereinafter Mr. Woo), FRANCISCO UBALDO (hereinafter Mr. Ubaldo), TERESA M. BROCK (hereinafter "Mrs. Brock"), WISSAM HALHOUL (hereinafter

2
COMPLAINT

"Mrs. Halhoul"), and DOES 1-200 bring this COMPLAINT to vindicate their Federal and State constitutional, statutory and common law rights.

2.      PLAINTIFFS Robert Brock, Amanda Denton, Jeffery Lao, Kamal Dayekh, Christopher Montoya, Wilson Woo, Francisco Ubaldo, and Does 1-200, (collectively referred to as Plaintiffs) allege that DEFENDANT CONCORD AUTOMOBILE DEALERSHIP LLC DBA: LEXUS OF CONCORD (hereinafter "DEFENDANT LEXUS OF CONCORD" or "EMPLOYER"), through its managing agents, retaliated against PLAINTIFFS for engaging in protected activity, including complaining about wrongful refusal to pay wages when due and to require PLAINTIFFS to pay taxes on inflated and unpaid wages. Also, DEFENDANT PATRICK MILIANO and DEFENDANT GREG JAMES subjected PLAINTIFFS to a hostile and violent work environment and treated Ms. Denton differently based on her gender and race, female. PLAINTIFFS Mr. Woo, Mr. Montoya and Mr. Ubaldo allege Constructive Discharge due to an intolerable hostile and violent work environment. PLAINTIFFS Mrs. Brock and Mrs. Halhoul allege that the behavior of DEFENDANT CONCORD AUTOMOBILE DEALERSHIP LLC DBA: LEXUS OF CONCORD, through their managing agents, caused them Loss of Consortium due to the extreme stress suffered by their husbands, as well as stress and fear caused by threats of violence against their families.

## JURISDICTION AND VENUE

3.      PLAINTIFFS bring this action pursuant to the laws of the United States of America, including violations of the  Fair Labor Standards Act 29 USCS § 201, §§ 11(c), 15(a)(5) by failing to keep adequate and accurate records of the wages paid to employees. Further, PLAINTIFFS bring this action under the State of California Labor Code §221, providing that is unlawful for an employer to collect or receive from an employee any part of the wages already

3
COMPLAINT

paid to that employee; Labor Code §223, providing that it is unlawful to pay less than any contract or statute requires, while purporting to pay the required wage; and Labor Code §226 providing that employers must provide an itemized breakdown each time the employer makes deductions from an employee's paycheck. California Fair Employment and Housing Act, Title VII of the 1964 Civil Rights Act, as amended.  Jurisdiction is founded upon 28 U.S.C. § 1331.

4.      Venue is proper in this judicial district because PLAINTIFFS' injuries, damages and harm, including the violation of PLAINTIFFS' Rights occurred in this judicial district.  Further, one or more of the DEFENDANTS reside, are headquartered and conduct business in this judicial district.

5.      DEFENDANTS are subject to suit in this Judicial District and regularly employ 15 or more persons.

## **PARTIES**

6.      PLAINTIFF ROBERT BROCK, European-American, is a citizen of the United States of America and is a resident of Escalon, CA.  At all times herein relevant, Mr. Brock was a Sales Manager for DEFENDANT LEXUS OF CONCORD.

7.      PLAINTIFF AMANDA BO DENTON, Thai-American, is a citizen of the United States of America and is a resident of Fairfield, CA. At all times herein relevant, Ms. Denton was an employee of DEFENDANT LEXUS OF CONCORD.

8.      PLAINTIFF JEFFERY LAO, Filipino-American, is a citizen of the United States of America and is a resident of San Ramon, CA. At all times herein relevant, Mr. Lao was an employee of DEFENDANT LEXUS OF CONCORD.

4
COMPLAINT

9.     PLAINTIFF KAMAL DAYEKH, of Lebanese descent, is a permanent resident of the United States of America and is a resident of Brentwood, CA. At all times herein relevant, Mr. Lao was an employee of DEFENDANT LEXUS OF CONCORD.

10.     PLAINTIFF CHRISTOPHER MONTOYA, Mexican-American, is a citizen of the United States of America and is a resident of Brentwood, CA. At all times relevant herein, Mr. Montoya was an employee of DEFENDANT LEXUS OF CONCORD, until his constructive discharge due to intolerable hostile work environment conditions in October 2013.

11.     PLAINTIFF WILSON WOO, Chinese-American, is a citizen of the United States of America and is a resident of San Francisco, CA. At all times relevant herein, Mr. Woo was an employee of DEFENDANT LEXUS OF CONCORD, until his constructive discharge due to intolerable hostile work environment conditions in October 2013.

12.     PLAINTIFF FRANCISCO UBALDO, Dominican-American of African descent, is a citizen of the United States of America and is a resident of Oakland, CA. At all times relevant herein, Mr. Ubaldo was an employee of DEFENDANT LEXUS OF CONCORD, until his constructive discharge due to intolerable hostile work environment conditions in January 2014.

13.     PLAINTIFF TERESA M. BROCK is a citizen of the United States of America and is a resident of Escalon, CA. At all times herein relevant, Mrs. Brock was the spouse of PLAINTIFF ROBERT BROCK.

14.     PLAINTIFF WISSAM HALHOUL is a citizen of the United States of America and is a resident of Brentwood, CA. At all times relevant herein, Mrs. Halhoul was the spouse of PLAINTIFF KAMAL DAYEKH.

15.     DEFENDANT CONCORD AUTOMOBILE DEALERSHIP, LLC is an LLC, incorporated under the laws of the State of California. DEFENDANT CONCORD

AUTOMOBILE DEALERSHIP, LLC does business in Contra Costa County under the fictitious business name LEXUS OF CONCORD LLC

16.     DEFENDAN HANK TORIAN is the owner of DEFENDANT CONCORD AUTOMOBILE DEALERSHIP, LLC and is a resident of San Mateo, CA.

17.     DEFENDANT PATRICK MILIANO was a General Sales Manager of DEFENDANT LEXUS OF CONCORD and is a resident of Pleasant Hill, CA.

18.     DEFENDANT GREG JAMES is the GENERAL MANAGER of DEFENDANT LEXUS OF CONCORD and is a resident of Dublin, CA.

19.     DEFENDANTS TOYOTA MOTOR SALES U.S.A, INC. is a California corporation headquartered in Torrance, California. Plaintiffs allege on information and belief that that DEFENDANT TOYOTA MOTOR SALES U.S.A, INC authorizes DEFENDANT CONCORD AUTOMOBILE DEALERSHIP, LLC and DEFENDAN HANK TORIAN to sell Lexus brand cars.

20.     At all relevant times herein, LEXUS OF CONCORD  was owned and operated by supervisors, managers, and managing agents of CONCORD AUTOMOBILE DEALERSHIP, LLC DBA: LEXUS OF CONCORD, TOYOTA MOTOR SALES U.S.A, INC, HANK TORIAN, and as such was prohibited by law from harassing and retaliating against employees on the basis of complaining about improper withholding of wages, hostile work environment, and discrimination in the workplace.

## **RESPONDEAT SUPERIOR**

21.     All of the described conduct, acts, and failures to act are attributed to agents and managing agents of CONCORD AUTOMOBILE DEALERSHIP, LLC DBA: LEXUS OF CONCORD, TOYOTA MOTOR SALES U.S.A, INC, and HANK TORIAN. Said acts, conduct

and failures to act were within the scope of such agency and employment. At all times relevant herein, each participant was acting within the course and scope of his or her employment and agency. Each DEFENDANT, at all relevant time, was acting as the agent and co-conspirator of the other, and each endorsed, ratified, encouraged, agreed with, and took overt acts to carry out, and accomplish, the illegal conduct, activities and schemes alleged herein.

22.     DEFENDANTS CONCORD AUTOMOBILE DEALERSHIP, LLC DBA: LEXUS OF CONCORD, HANK TORIAN, and DEFENDANTS TOYOTA MOTOR SALES U.S.A, INC, the parent company of LEXUS OF CONCORD, and each of them, intentionally, willfully, and negligently failed to provide any oversight over DEFENDANT LEXUS OF CONCORD to ensure compliance with all Federal and State laws, including, but not limited to, laws mandating the timely and correct payment of employees' wages; laws mandating that employees work in an environment free of discrimination; and laws mandating that employers refrain from retaliating against employees who participate in protected activity, such as employees complaining about the untimely and inaccurate payment of wages

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

23.     PLAINTIFFS have exhausted their administrative remedies by filing charges of discrimination with appropriate federal and/or state agencies and by complying with the Government Code. PLAINTIFF Mr. Brock filed charges of discrimination with the EEOC on April 21, 2014. PLAINTIFF Mr. Lao filed charges of discrimination with the EEOC on April 21, 2014. PLAINTIFF Ms. Denton filed charges of discrimination with the EEOC on April 21, 2014. PLAINTIFF Mr. Dayekh filed charges of discrimination with the EEOC on April 21, 2014.

PLAINTIFF Mr. Montoya filed charges of discrimination with the EEOC on April 23, 2014. PLAINTIFF Mr. Woo filed charges of discrimination with the EEOC on April 23, 2014. PLAINTIFF Mr. Ubaldo filed charges of discrimination with the EEOC on April 24, 2014.

24.     PLAINTIFF Mr. Brock filed charges of discrimination with the Department of Fair Employment and Housing on April 21, 2014. PLAINTIFF Mr. Lao filed charges of discrimination with the Department of Fair Employment and Housing on April 21, 2014. PLAINTIFF Ms. Denton filed charges of discrimination with the Department of Fair Employment and Housing on March 7, 2014. PLAINTIFF Mr. Dayekh filed charges of discrimination with the Department of Fair Employment and Housing on April 21, 2014. PLAINTIFF Mr. Montoya filed charges of discrimination with the Department of Fair Employment and Housing on April 23, 2014. PLAINTIFF Wilson Woo filed charges of discrimination with the Department of Fair Employment and Housing on April 23, 2014. PLAINTIFF Mr. Ubaldo filed charges of discrimination with the Department of Fair Employment and Housing on April 24, 2014.

25.     PLAINTIFF Mr. Brock filed a complaint with the California Labor Commission on April 21, 2014. PLAINTIFF Mr. Lao filed a complaint with the California Labor Commission on April 21, 2014. PLAINTIFF Ms. Denton filed a complaint with the California Labor Commission on April 21, 2014. PLAINTIFF Mr. Dayekh filed a complaint with the California Labor Commission on April 21, 2014. PLAINTIFF Mr. Montoya filed a complaint with the California Labor Commission on April 23, 2014. PLAINTIFF Mr. Woo filed a complaint with the California Labor Commission on April 23, 2014. PLAINTIFF Mr. Ubaldo filed a complaint with the California Labor Commission on April 24, 2014.

26.    PLAINTIFFS will amend their complaint after receipt of their Federal and State Right to Sue letters.

## WORKERS' COMPENSATION EXCLUSIVITY DOES NOT APPLY

27.    Each and every wrongful, injurious, intentional, willful, discriminatory, harassing act and failure to act by DEFENDANTS were not normal incidents of employment and were outside the scope of the employment bargain.  Thus, Workers' Compensation exclusive remedy set forth in California Labor Cod § 3600 et seq. will not preempt, nor bar PLAINTIFFS' right to recover for damages set forth herein.

28.    PLAINTIFFS did not perform "exempt" duties in their capacities as employees of DEFENDANT LEXUS OF CONCORD and therefore are subject to the wage and hour provisions as non-exempt employees under the Fair Labor Standards Act and under the California Labor Code. PLAINTIFFS were employees entitled to timely and accurate payment of all wages when earned, including non-discretionary bonuses. Non-discretionary bonuses include those that are announced to employees to encourage them to work more steadily, rapidly or efficiently, and bonuses designed to encourage employees to remain with DEFENDANT LEXUS OF CONCORD and increase car sales.

## DEFENDANTS' ILLEGAL ACTIVITY

29.    DEFENDANTS, and each of them, engaged in illegal activities which include, but are not limited to the following:

- Requiring employees to pay state and federal income taxes on inflated wages which were not paid to employees, lowering the employees' net income; retaliating against employees who engaged in protected activity;

9
COMPLAINT

- Wrongfully terminating employees who engaged in protected activities, including "Whistleblowing" against an illegal practice of inflating taxable income;

- Retaliating against employees who complained about a hostile work environment directed at employees and customers of LEXUS OF CONCORD;

- Engaging in a pattern and practice of illegal conduct violating the Fair Labor Standards Act and the California Labor Code (Labor Code §221 which provides that it is unlawful for an employer to collect or receive from an employee any part of the wages already paid to that employee; Labor Code §223 which provides that it is unlawful to pay less than any contract or statute requires, while purporting to pay the required wage; and Labor Code §226 which provides that employers must provide an itemized breakdown each time the employer makes deductions from an employee's paycheck) by failing to keep adequate and accurate payroll records and failing to correctly pay earned wages and converting employees' wages;

- Engaging in a pattern and practice of illegal conduct violating Title VII, FEHA, and Business and Professions § 17200.

30.    DEFENDANT MILIANO, the ostensible General Sales Manager, engaged in illegal activities which include, but are not limited to the following:

- Referring to racial minorities and women with vile epithets such as "Fish Eaters", "Turban Heads", "Niggers", "Cunts", "Whores", "Skanky Hoes", to cite just a few;

- Threatening violence against employees, including threats to kill employees, their wives, and their children;

- Bringing, showing, keeping, and maintaining guns and swords in the work place;

- Conspiring to embezzle and convert PLAINTIFFS' earned wages;

10

COMPLAINT

## STATEMENT OF FACTS

### PLAINTIFF MR. ROBERT BROCK

### DEFENDANTS' RETALIATION FOR PROTECTED ACTIVITY

***Theft of Employees' Earnings by Fraudulent Inflation of Employees' Taxable Wages***

31.     PLAINTIFF Mr. Brock is a loyal employee of DEFENDANT LEXUS OF CONCORD and has been employed by DEFENDANTS since July 2008.  For many years, Mr. Brock has enjoyed working as Sales Manager, enjoying the status of the number one ranking manager in sales. His job once was both rewarding and fulfilling. However, recently the hostility directed toward Mr. Brock in the work environment has mounted to an escalating, intolerable level because he has engaged in statutory protected activity under California Labor Code § 1102.5. This code provides, in pertinent part, the following:

California Labor Code Section 1102.5 provides:
> (a)An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.  (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.  (c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

32.     The DEFENDANTS LEXUS OF CONCORD and TOYOTA MOTOR SALES U.S.A, INC'S  sales employee Payment Plan includes the following:

**Used Car "Spiff" Money** - Each salesperson who sells a used car on any given day gets $100.00 cash "Spiff Money", (cash wages earned as incentive pay for performance), the total amount of which is paid every Friday when the General Sales Manager, DEFENDANT

11
COMPLAINT

MILIANO, gets a "Cash Bag" of several thousand dollars which has been picked up at the bank by Dory Sosa from the business office.

**Weekend "Pyramid Spiff" Money** - On the weekends employees earn a wage called a Pyramid Spiff. This Spiff consists of paying $25 to the first salesperson who sells a car; thereafter this person becomes number 1 on the pyramid and is paid $25 for every car that is sold on that day, provided that the target goal, "Bogi" is met.   Most of the time, the sale of ten (10) cars constitutes the Bogi. Each salesperson on the pyramid who sells a car gets $25 for each car sold after the one he or she has sold. The last person on the Pyramid only gets $25, but the first person on the Pyramid with a 10 car Bogi receives a Spiff wage of 10x $25.  The Spiff wage is added to the salesperson's pay check as earnings and he or she is taxed on this amount.  This Spiff is reflected on the salesperson's pay stub on the left hand side as "SPIFF", showing the dollar amount.

**Spiff Vouchers:** The Spiff money for used cars and the spiff money for the weekend Pyramid are paid in cash money and a triplicate carbon copy Voucher is issued.  The salesperson and sales manager must sign the Voucher. The salesperson is given one of the three (3) copies as a receipt. The DEFENDANT MILIANO turns the remaining two copies of the Voucher into the Business Office to account for the cash paid.

***DEFENDANTS' Fraudulent Inflation of Employees' Taxable Wages Scheme***

33.     As an example for the scheme: DEFENDANTS issues the salesperson a voucher for $875, the salesperson signs it and is handed a copy of the Voucher as a receipt. DEFENDANT MILIANO turns in a totally different Voucher for the same transaction with an increased dollar amount of $1,375, either unsigned or with a forged salesperson's signature on the Voucher and pockets the difference in cash, resulting in the salesperson paying taxes on the fraudulent,

inflated dollar amount. Additionally, DEFENDANT MILIANO also randomly submits to the business office fraudulent Vouchers in the name of salespersons but without a salesperson's signature. He then keeps all the cash, and HR bases the salesperson's taxes on fraudulent Voucher records, resulting in the salesperson paying taxes on money he or she has never received, thereby reducing the salesperson's net wage income by paying considerably higher taxes. Presumably DEFENDANTS have engaged in this fraudulent Spiff Voucher Scheme for years.

34.     In February 2014, Mr. Lao brought to Mr. Brock's attention that DEFENDANTS were inflating the amount of his SPIFF wage vouchers and were paying him a lesser amount of wages for "SPIFFS" yet were including the higher amounts on his taxable income. Mr. Lao showed the vouchers to Mr. Brock and asked him what to do about the problem. Mr. Brock told Mr. Lao to go to Greg James, the General Manager. Mr. Brock then also complained to the General Manager, DEFENDANT JAMES, about this illegal conduct.

35.     For example, Mr. Brock observed that Mr. Lao had signed a Voucher acknowledging receipt of a cash-SPIFF in the amount of $875, but the business office had received a copy of a different Voucher for the same transaction, with Mr. Lao's forged signature, in the amount of $1,375, creating an increased taxable income of $500. Mr. Lao presented to Mr. Brock five (5) or six (6) of these vouchers, each reflecting an inflated taxable wage on which Mr. Lao had been taxed, but wages which he had not received. This illegal conduct is known and can be verified by the Finance Managers Tim Vu, PLAINTIFF Kamal Dayekh, and Human Resource Manager Dori Sosa.

36.     Late in February, 2014 Mr. Brock complained again to DEFENDANT JAMES about the inflated Spiff wage vouchers for employees. By then, Mr. Brock had discovered that

numerous employees had been victims of this same withholding of fraudulent, inflated taxable wages, resulting in an increased tax liability to the employees. This scheme created a net income loss for the employees. Further, Mr. Brock relayed to DEFENDANT JAMES that employees were reporting to him that their Spiff vouchers appeared to be forged by DEFENDANT MILIANO.

37.     Mr. Brock was also complaining to management about other illegal conduct, including DEFENDANT manager Patrick Miliano's history, pattern, and practice of creating a hostile and violent work environment towards employees and customers. DEFENDANT MILIANO'S illegal conduct had become increasingly intolerable by February of 2014.

38.     In February 2014, DEFENDANT MILIANO initiated a verbal altercation with a customer and threatened violence against the customer, stating: "I'm going to lay you down". The customer called the police to the dealership. The Concord Police Department has a police report on file regarding this incident. Mr. Brock was on duty and witnessed this event.  This incident was recorded on Yelp: "2/18/2014 Patrick Miliano. Watch out for him. If he does not like the review you left him on yelp he will call you a 'coward' to your face and threaten to 'lay you down'. He tries to provoke you into an argument, then use that against you to refuse service to you because, 'you are out of control' according to him. Once they are done with you, the finance department will not return your calls."

39.     On or about March 1, 2014, DEFENDANTS retaliated against Mr. Brock, demoting him from Sales Manager on the night shift, a position he had enjoyed for seven (7) years, to Used Car Manager on the day shift in an entirely different building. Mr. Brock had diligently worked his way up from salesman to Internet Manager to New Car Sales Manager. This schedule shift, which had no legitimate business reason, has presented a major hardship for Mr. Brock because

commuting during rush hour adds close to an hour each way to his commute from Escalon, two hours away from the dealership. As further retaliation against Mr. Brock, towards the end of February, effective on March 1, 2014, DEFENDANTS moved Mr. Brock to the Used Car building because Mr. Brock was complaining and asking questions about the Employees' Spiff vouchers, including the vouchers of PLAINTIFF Mr. Lao. Additionally, in another act of retaliation, a brand new employee, Efrain, was promoted to Sales Manager and given Mr. Brock's office in the New Car building. Efrain had been working at the dealership for less than a month. Mr. Brock's employee status as a consistent top performer for seven years (7) proves that Mr. Brock was the only possible choice and should have been promoted instead of the new employee, whose performance had to that point only created negative loss profit sales.

40.     On or about March 10, 2014, Mr. Brock and Used Car Manager Daniel Soures met and conferred with DEFENDANT JAMES, advising him of the fraudulent inflation of employees' taxable wages. Mr. Brock showed DEFENDANT JAMES previous pay stubs which reflected $1,900 worth of vouchers which he had never received. Mr. Brock knew that he should not have had Spiff vouchers in his pay because managers do not get Spiff vouchers. Mr. Brock also informed DEFENDANT JAMES that other employees had substantial voucher discrepancies in their pay, including Mr. Farid. Mr. Brock further explained that he believed that DEFENDANT MILIANO was attempting to pay back wages earned and owed as a result of a fraudulent tax liability to PLAINTIFF Mr. Lao. Mr. Brock requested to see his own most recent pay stub, indicating that employees were having a hard time getting their pay stubs and that he wanted to see his most recent pay stub.  DEFENDANT JAMES went to the financial office and returned five minutes later, waiving Mr. Brock's pay stub in his hand and shaking his head.

DEFENDANT JAMES showed Mr. Brock his pay stub which revealed $3800 of cash Spiffs Mr. Brock had not received, but for which he had paid state and federal taxes.

41.    At this time, PLAINTIFF Mr. Dayekh, a Finance Director, also spoke to DEFENDANT JAMES and mentioned that there was a complaint by Jeff Lao regarding the voucher scheme. Despite being told about it, DEFENDANT JAMES denied that he had heard about the voucher scheme. On March 9 and 10, 2014, Mr. Dayekh sent emails to DEFENDANT JAMES and the business manager Chris Carvalho regarding the voucher issue, without results.  On March 13, 2014, Mr. Dayekh sent DEFENDANT JAMES and other employees an anonymous email regarding the voucher issue.

42.     On or about March 13, 2014, Mr. Brock received the anonymous email concerning the theft of employees' earnings by the fraudulent inflation of employees' taxable wages ("Inflated Spiff Voucher Scheme"). This email was sent to various managers, including, but not limited, the following: Chris Carvalho and Dori Sosa of HR, Tim Vu, a Finance Manager, PLAINTIFF Mr. Dayekh, Salesperson Jason Steiner, and Sales Manager Efrain Moreno. The email stated:

> **"TO WHOM IT MAY CONCERN. THIS SITUATION HAS GONE TOO FAR!!! THE SALES MANAGER OF THE NEW CARS DEPARMENT AT LEXUS OF CONCORD HAS BEEN TURNING IN COMMISSION VOUCHERS FOR THE SALES PEOPLE THAT ARE INCORRECT.**
> **HE GIVES US CASH FOR AN AMOUNT, BUT TURNS IN A VOUCHER FOR MORE CASH AMOUNT THAN WHAT HE PAID OUT WITH A DIFFERENT SIGNATURE.**
> **ONE OF US GOT THREATENED THAT HE WILL LOSE HIS JOB IF HE COMES FORWARD AND EXPOSES THE NEW CAR SALES MANAGER.**
> **NOW MORE THAN 4 PEOPLE HAVE BEEN VICTIMS OF THIS ACT, AND THEY ARE AFRAID TO COME OUT AND SAY SOMETHING.**
> **WE NEED YOUR HELP TO YOUR HELP TO RESOLVE THIS AND WHEN YOU FIND OUT THAT THIS IS TRUE, A TERMINATION SHOULD TAKE PLACE FOR THE PERSON THAT IS COMITING [SIC] THIS ACT.**

**IF IT IS NOT RESOLVED ASAP THE NEXT STEP WOULD BE TO INFORM THE OWNER AND THE LEGAL AUTHORITIES TO GE THE MONEY WE EARNED BACK.**
**THIS IS CALLED "THEFT" AND IT IS NOT ACCEPTABLE AT ALL.**

43.   On or before March 13, 2014, DEFENDANT JAMES had been informed and knew about the $4,700 in fraudulent inflation of taxable wages for Mr. Brock, the $3300 for Mr. Lao, and the $1000 for Mr. Farid. DEFENDANTS failed to take any corrective action to remedy and fix the theft of employee wages. Instead, DEFENDANT JAMES continued to have social and friendly interaction with DEFENDANT MILIANO, including socializing with DEFENDANT MILIANO in DEFENDANT MILIANO's office, watching Youtube videos and sharing a good Laugh.

### *Violence and Threats of Violence in Workplace*

44.   On or about March 13, 2014, DEFENDANT MILIANO stormed into Mr. Brock's office and slammed a piece of paper of Mr. Brock's desk, his face contorted and flushed in anger and fury: "I know you sent this fucking email to management. I'm going to kill you, I am going to hunt you down, and I'm going to kill your wife, and I'm going to kill your kids." Shocked, frightened, and terrified, Mr. Brock made an effort to reduce the tension because he was afraid and apprehensive that DEFENDANT MILIANO was going to attack him. Mr. Brock responded calmly that he did not know who had sent the email. DEFENDANT MILIANO snatched the email from the desk and stormed out of the office. Mr. Brock learned shortly thereafter that DEFENDANT MILIANO had gone over to Mr. Dayekh's office and threatened to kill Mr. Dayekh and his family, as well.

45.   On or about March 14, 2014, Mr. Brock and Mr. Dayekh informed DEFENDANT JAMES of the death threats and told DEFENDANT JAMES that he and Mr. Dayekh were going

to the Concord Police Department to file a complaint and a police report. Instead of being appalled that one of his managers had harassed and assaulted two other managers, and instead of commiserating, supporting, and offering assistance and protection, DEFENDANT JAMES stated emphatically: "If you file a police report it will be like stabbing me in the back because I am up for partnership in this dealership." DEFENDANT JAMES showed no concern for the threats to the lives of his managers and their families; he evidenced only concern for his partnership with DEFENDANT HANK TORIAN and ensuring that DEFENDANT TORIAN did not know about the fraudulent inflation of employees' taxable wages. In an effort to quell and cover up the theft, fraud and the threats and violence in the workplace, DEFENDANT JAMES exhorted Mr. Brock to keep quiet and he would make sure that all of the employees were paid back the taxes they had paid, which had diminished their net income.

46.     On or about March 18, 2014, Mr. Brock, suffering from terrifying mental and emotional distress, had high power security lights installed all around his home because he and his wife were afraid that DEFENDANT MILIANO would carry out his threats and come to their home to hurt them. Mr. and Mrs. Brock's fears were even deeper and more intense because DEFENDANT MILIANO had previously brought guns and swords to the workplace, showed them off and kept them in his office. Further, Mr. Brock had witnessed DEFENDANT MILIANO threatening to kill a customer, avowing, "I will lay you down."

47.     On or about April 2, 2014, Mr. Brock, on his day off from work, attempted to reach the owner of the dealership, DEFENDANT HANK TORIAN, but could only connect with his secretary, Debbie Pullium. Mr. Brock, desperate to find help, then spoke to the owner's secretary, explaining the Inflated Spiff Voucher Scheme and the threats to his and his family's lives. Mr. Brock spoke to Debbie Pullium for over an hour. Mr. Brock further explained to

Debbie Pullium, that based on his observation of the conduct and relationship between DEFENDANT MILIANO and DEFENDANT JAMES, DEFENDANT JAMES was engaged in a cover up of DEFENDANT MILIANO'S illegal activities. Mr. Brock informed Debbie Pullium that he was planning to inform Chris Carvalho of HR of all the illegal conduct.  Later on the same afternoon, Mr. Brock had another conversation with Debbie, letting her know that he had informed Chris Carvalho in HR about the Inflated Spiff Voucher Scheme and threats.

48.     On or about April 3, 2014, DEFENDANT MILIANO sent a text to Mr. Brock, stating that he knew that Mr. Brock was the one who had informed Chris in HR about the Voucher Scheme. DEFENDANT MILIANO's threatening phone call further elevated the already paralyzing fear, anxiety, and concern Mr. Brock felt for himself and his family. Mr. Brock felt increasingly isolated, vulnerable, and betrayed because his confidential report to management had been revealed to DEFENDANT MILIANO. Mr. Brock had only reported DEFENDANT MILIANO's misconduct to three persons of authority: Debbie Pullium, DEFENDANT HANK TORIAN's secretary, Chris Carvalho, the DEFENDANTS' Business Manager, and General Manager DEFENDANT JAMES.  Mr. Brock was dismayed and scared that management had again failed to protect him from a hostile, violent work environment, ignoring his plea for protection and corrective action.

49.     On or about April 3, 2014, DEFENDANTS took further retaliatory action against Mr. Brock. DEFENDANTS changed Mr. Brock's work schedule. For the past six (6) years, Mr. Brock has been the night manager, always working night shifts from 12pm to 9pm. Mr. Brock always had an understanding with management that due to his long commute, 72 miles each way, Mr. Brock was allowed to work nights so as to avoid rush hour traffic. This all changed on April 3, 2014, after DEFENDANT MILIANO was fired. DEFENDANT JAMES hand-wrote a

schedule and handed it to Mr. Brock, stating without explanation, "This is your new schedule". The schedule was for day shifts. In response, Mr. Brock urged Mr. James to implement the vacation schedule which had been used just one (1) month prior while DEFENDANT MILIANO was on vacation. This particular schedule allowed Mr. Brock two (2) days off and work all nights, and this schedule had worked very well. In response to this suggestion, DEFENDANT JAMES simply stated: "No, this is the schedule we will use till further notice!" DEFENDANT JAMES was fully aware that this change in schedule forces Mr. Brock to leave home at 6:45am in order to arrive timely at work by 9am and forces him to return home from work at 11:30pm. DEFENDANT JAMES utterly ignored the hardship to Mr. Brock and his family by implementing this retaliatory schedule.

50.     On or about April 7, 2014, Mr. Brock suffered another sleepless night. Racking his brain to seek protection from the threats to his family and his own life, around 2am Mr. Brock sent an email to HR Manager, Chris Carvalho. This email was a formal statement and complaint, detailing the harassment resulting from his activity as a whistleblower. Later on the same day, Mr. Brock went into Chris Carvalho's office and asked her if she had received his email. When she stated that she had not, Mr. Brock told her that he would print a copy for her.  Mr. Brock returned with a copy to Chris Carvalho's office. Debbie Pullium was also present in the office. Chris handed the email to Debbie and asked her to read it first. Mr. Brock told both of them that he wished for this complaint be entered into his employee file in case something were to happen to him. Mr. Brock again stressed his concern for his and his family's life, and repeated his concern for the retaliation which was taking place at work.

51.     On or about April 16, 2014, Mr. Brock experienced another sleepless night. He expresses his emotional disorientation and trauma as follows: "On my way to work the next day, I was

driving along and realized then I see the road become two (2) lanes and I'm thinking to myself this road should be four (4) lanes. Then it dawns on me that I'm on the wrong freeway and I quickly turn on my navigation to find out I'm thirty-three (33) miles further away from my work. I had missed my turn and drove thirty-three (33) miles before I even realized I was going wrong way. I have never done anything like this before in my life. I have always had a very good sense of direction so I was now very concerned for my health and called my wife and told her what had happened. I asked her to call the advice nurse and make an appointment for me right away. I went to a doctor and explained to her all the stress at work and told her I'm not sleeping at night because my mind just keeps thinking about work. The doctor agreed, stating that my stress and anxiety levels were off the charts and prescribed me some sleeping pills and anxiety medicine." Mr. Brock has filed a police report against DEFENDANT MILIANO at the Concord Police Department on April 20, 2014. Mr. Brock has contemporaneously filed for a Restraining Order against DEFENDANT MILIANO.

**HOSTILE WORK ENVIRONMENT**

52.     DEFENDANT MILIANO regularly and freely repeated highly offensive comments when referring to customers and employees as "Fish-heads", "Niggers",  "Dog-eaters", and "Towel-heads," "Faggots," "Cunt", "Bitches", to cite a few.  Mr. Brock repeatedly objected to these offensive comments and complained to DEEFENDANT MILIANO and DEFENDANT JAMES. Mr. Brock observed and heard DEFENDANT MILIANO call Ms. Denton various derogatory comments such as "Skanky hoe", "Bitch", "Cunt", and other offensive names. When learning that DEFENDANTS were going to or had fired Ms. Denton, Mr. Brock and other employees complained to DEEFNDANT JAMES and DEFENDANT MILIANO that it was unfair and wrong to terminate Ms. Denton as she was one of the top performers.

**PLAINTIFF MR. JEFFERY LAO**

**DEFENDANTS' RETALIATION FOR PROTECTED ACTIVITY**

***Theft of Employees' Earnings by Fraudulent Inflation of Employees' Taxable Wages***

53.      PLAINTIFF Mr. Lao is a loyal employee of DEFENDANT LEXUS OF CONCORD and has been employed by DEFENDANTS since May 2006. For several years, Mr. Lao enjoyed working as a Salesperson, enjoying the status of a ranking salesperson. His job once was both rewarding and fulfilling. However, recently, the hostility directed toward Mr. Lao in the work environment has mounted to an escalating, intolerable level because he has engaged in statutory protected activity.

54.      In February 2014, Mr. Lao noticed that his paycheck was incorrect. Initially, Mr. Lao was unsure about the discrepancy. He went to HR and spoke to Dori Sosa, one of the HR managers. Dori showed him copies of signed Spiff wage vouchers that had been turned in to HR on his behalf. She allowed him to take copies. After inspecting the copies of the vouchers, Mr. Lao realized that Spiff wage vouchers had been issued in his name, yet he had never received the wages.  He also noticed there were several vouchers with signatures that were not his. These vouchers also contained an amount of wages greater than the amount of money he had actually received.

55.      Mr. Lao then spoke to Mr. Brock who advised him to see DEFENDANT JAMES. Mr. Lao did so and complained to DEFENDANT JAMES about the discrepancies, showing him the vouchers and pointing out that some had forged signatures, and some were turned in for more wages then the amount stated on his copy of vouchers. During this conversation, DEFENDANT JAMES called DEFENDANT MILIANO into his office. Mr. Lao had to attend to a customer during this meeting. After Mr. Lao finished attending to his customer, on his way to return to

DEFENDANT JAMES' office, he observed DEFENDANT MILIANO standing by the front desk, holding Mr. Lao's vouchers in his hand. DEFENDANT MILIANO asked Mr. Lao to have a coffee or juice, telling Mr. Lao to take a ride in his car with him. Mr. Lao was seriously worried about his boss's request when he stated: "Jeff, let's go for a ride."

### Violence and Threats of Violence in Workplace

56.     DEFENDANT MILIANO escorted Mr. Lao to his car, parked next to the General Manager's parking space which is adjacent to a ravine and dense shrubs. While standing next to the car, DEFENDANT MILIANO smirked and stated, "If I cut you up into little pieces and throw you down the ravine, no one will ever find you." Apprehensively, Mr. Lao got into the car and they went to a nearby Jamba Juice store.

57.     As DEFENDANT MILIANO drove Mr. Lao to Jamba Juice, he said: "Jeff, you make a lot of money here right? You would not want to jeopardize this would you? I will pay you back the money, but do not tell anyone about this!" DEFENDANT MILIANO continued: "I give people money in the store that I can't turn in vouchers for, like Jenn, so this is why I turned vouchers in on you!" DEFENDANT MILIANO then grabbed all of Mr. Lao's wage vouchers, held on to them and shredded them when they got back to the store, then told him to tell Dori Sosa in HR that "everything was OK!" Mr. Lao was extremely distressed and fearful about the "Catch-22" situation in which he was placed. He had one choice: To give up his rights to his wages or give up his job. It was illegal and a violation of federal and state laws for DEFENDANTS to place Mr. Lao in this stressful predicament. DEFENDANT MILIANO'S first explanation to Mr. Lao for the increased taxes and decreased net income reflected on his pay stub was Obamacare. Then he stated that taxes are always higher in January, February and March.

23

COMPLAINT

58.     DEFENDANT JAMES willfully failed to protect Mr. Lao from the illegal Voucher Scheme, intimidation, and threats of termination. Instead, DEFENDANT JAMES acquiesced, ratified, endorsed, and conspired with DEFENDANT MILIANO to deprive Mr. Lao of his wages.

59.     In February 2014, Mr. Lao shared the discovery of the Voucher Scheme with several salesmen. During this exchange, Mr. Lao learned that other salespeople had experienced the same wage shortages. The discovery of the inflated Spiff Voucher Scheme slowly spread throughout the dealership.

60.     On or about March 10, 2014, Mr. Lao discovered that DEFENDANT MILIANO had created even more wage shortages with his fraudulent voucher scheme than the amount reflected in the vouchers shredded by DEFENDANT MILIANO. Afraid to complain again to DEFENDANT JAMES, Mr. Lao went back to Mr. Brock. Mr. Lao told Mr. Brock about DEFENDANT JAMES and DEFENDANT MILIANO's discussion regarding the fraudulent Spiff vouchers. Mr. Lao showed the vouchers to Mr. Brock, explaining that when he had complained to DEFENDANT JAMES, DEFENDANT JAMES had sent him to DEFENDANT MILIANO. Mr. Lao further explained to Mr. Brock that DEFENDANT MILIANO had threatened his job and tried to pay him back with bogus vouchers. Mr. Lao gave Mr. Brock five (5) vouchers of which he fortunately had extra copies, showing evidence of the Voucher Scheme. Mr. Brock assured and promised Mr. Lao that he would look into it.

61.     Later on the same day, March 10, 2014, Mr. Brock informed Mr. Lao that he had met with DEFENDANT JAMES, and that DEFENDANT JAMES had indicated that all of the employees would get their money back and he would deal with the situation. Mr. Lao was relieved.

62.     On or about March 13, 2014, to Mr. Lao's surprise, DEFENDANT MILIANO was still working at the Dealership. Mr. Lao also discovered that DEFENDANT MLIANO had made death threats to his boss, Mr. Brock, and to a Finance Director, Mr. Dayekh. Upon learning of these threats and remembering what DEFENDANT MILIANO had threatened him with before the ride to Jamba Juice, Mr. Lao immediately became terrified and fearful that he too was going to be subjected to DEFENDANT MILIANO'S violent threats and bodily harm, because Mr. Lao had also complained about DEFENDANT MILIANO's voucher scheme.   Later that day, DEFENDANT MILIANO sought out Mr. Lao and assured him, "Not to worry. I worked it out with Greg and I will be paying you back." DEFENDANT MILIANO then proceeded to give Mr. Lao cash money, which Mr. Lao was afraid and believed, was stolen money. At this point, Mr. Lao felt completely helpless and feared losing his job, as well as being terrified for his own safety in light of DEFENDANT MILIANO'S recent death threats against Mr. Brock, Mr. Dayekh and him.

63.     Today, Mr. Lao is still unsure of the total amount of federal and state income taxes he has paid on wrongfully reported and inflated wages which he did not receive. He is also uncertain as to when the theft of his wages first began to happen. He has repeatedly asked for his "read-backs" on his vouchers, but he describes this process "like pulling teeth".

64.     Mr. Lao's mental and emotional distress is aggravated by his fear of losing his job of eight (8) years, in which he works six (6) days a week, sometimes even seven (7) days a week. The emotional and mental distress the DEFENDANTS are inflicting on Mr. Lao with the threats, including the threat of termination of his employment and the loss of his earnings, is having a deleterious and disruptive impact on his family. His wife has expressed severe concern about Mr. Lao's mental and physical absence in their marriage since the discovery of DEFENDANTS'

illegal conduct. Mr. Lao, in his own words, describes the emotional impact to his family: "Because I am experiencing a lot of worries and loss of sleep at night, this is affecting my wife. She is getting mad at me because I am spaced out when she talks to me so I explained to her vaguely what is happening and she is also very upset, she wants me back to normal."

## HOSTILE WORK ENVIRONMENT

65.     DEFENDANT MILIANO regularly and freely used and repeated highly offensive comments, referring to customers and employees as "Fish-heads", "Niggers", "Dog-eaters", "Towel-heads", "Faggots," "Cunt", "Bitches", to cite a few. Mr. Lao repeatedly objected to these offensive comments and complained to DEFENDANT MILIANO and DEFENDANT JAMES. DEFENDANT MILIANO frequently called Mr. Lao "Homo", "Cyborg", "Dickweed", and "Fishhead". He consistently told co-workers to "Suck my Dickhole". Mr. Lao was offended but did not know where to turn because DEFENDANT MILIANO made these comments in the presence of the General Manager, DEFENDANT JAMES who never took any corrective or remedial action to end the hostilities and insults.

## PLAINTIFF MR. KAMAL DAYEKH

## DEFENDANTS' RETALIATION FOR PROTECTED ACTIVITY

### *Theft of Employees' Earnings by Fraudulent Inflation of Employees' Taxable Wages*

66.     PLAINTIFF Mr. Dayekh was a loyal employee of DEFENDANT LEXUS OF CONCORD and had been employed by DEFENDANTS since May 18, 2012. Mr. Dayekh enjoyed working as a Finance Director, and his job was both rewarding and fulfilling. However, beginning in February 2014, the hostility directed toward Mr. Dayekh in the work environment mounted to an escalating, intolerable level because he has engaged in statutory protected activity.

26
COMPLAINT

As a result of Mr. Dayekh engaging in protected activity by complaining about the fraudulent Inflated Spiff Voucher Scheme, DEFENDANTS wrongfully terminated his employment.

67.     In the third week of Feb 2014, Mr. Dayekh received a phone call from Tim Vu, his Finance Manager at DEFENDANT LEXUS OF CONCORD, after the end of his shift, while he was on his way home. Tim Vu informed Mr. Dayekh that he had lunch with Mr. Lao, a salesperson. Mr. Lao had informed Tim Vu that he had found out that his pay check had been showing a different amount of Spiff wages than the amount that he had actually received from DEFENDANT MILIANO. Also, Mr. Lao expressed to Tim Vu that he believed that DEFENDANT MILIANO had forged Mr. Lao's signature on some of the vouchers, resulting in Mr. Lao being taxed on a higher amount of money than he had received.

68.     Mr. Dayekh was deeply shocked and disturbed when he heard this. He inquired from Tim Vu if Mr. Lao had told DEFENDANT JAMES, The General Manager. Tim replied that Mr. Lao had brought this concern up to Mr. Brock, the Sales Manager. Mr. Brock had asked Mr. Lao to check first with Dori Sosa, one of the staff in the HR Business Office. Mr. Dayekh also learned that Mr. Lao again noticed more Spiff vouchers that were turned in for higher amounts than what he had received from DEFENDANT MILIANO.

69.     Mr. Dayekh informed Tim Vu, that as a Finance Director in the dealership and feeling a responsibility because of his position, he would take the problem to General Manager DEFENDANT JAMES' attention because, if true, it was a serious problem. When Mr. Dayekh went to work on the next day, Thursday Feb 20, 2014, he ran into Mr. Lao and asked him if what he had heard about the fraudulent Voucher Scheme was true and Mr. Lao replied that yes, it was true.

COMPLAINT

70.     Mr. Dayekh then went to speak to DEFENDANT JAMES at about noon the same day. Mr. Dayekh brought the matter of the fraudulent Voucher Scheme to DEFENDANT JAMES' attention.  DEFENDANT JAMES denied knowing anything about the scheme.

71.     After a few days, more news emerged about more sales people having noticed the same problems with their pay checks. Mr. Brock told Mr. Dayekh that Mr. Farid, one of the sales staff, Clint, one of the internet managers, and Mark, one of the sales people all had come forward and reported the same issue with wage shortages. Mr. Dayekh verified these facts with the sales people who had been mentioned, and all of them confirmed that they, as well, had wage shortages, just as Mr. Lao did.

72.     On or about Friday, February 28, 2014, Mr. Dayekh noticed during the sales meeting that Mr. Lao and DEFENDANT MILIANO were missing and did not attend the meeting. Later, Mr. Dayekh learned from Mr. Lao and Mr. Brock that DEFENDANT MILIANO had taken Mr. Lao on a ride in his car and instructed him not to say anything to anyone about what had happened, and that DEFENDANT MILIANO was going to repay the money that was stolen. Mr. Dayekh also learned that Mr. Lao was threatened by DEFENDANT MILIANO that if he spoke about any of the Voucher scheme he would lose his job.

73.     In March, DEFENDANT MILIANO left for a vacation. During his absence, Mr. Brock began to dig in his own records, only to discover that his check was short. He was a victim of the same voucher scheme as other employees, and about $4000 or more of spiff vouchers had been turned in which he had never received. Mr. Brock reported this to DEFENDANT JAMES. DEFENDANT JAMES claimed that he would look into it when DEFENDANT MILIANO returned.

74.     DEFENDANT MILIANO returned from his vacation on March 13, 2014. Mr. Dayekh arrived at work at 10am and noticed that DEFENDANTS JAMES and MILIANO were behaving completely normally, as if nothing unusual had occurred. They were both interacting as if nothing of consequence had happened. DEFENDANT JAMES left the dealership, and after some thought, at about 4pm, Mr. Dayekh sent an anonymous email to Chris Carvalho (Business Manager), Dori Sosa (HR), Tim Vu (Finance Manager), Efrain Moreno (New Car Sales Manager), Bob Brock (Used Car Manager), himself, Kimo Dayekh (Finance Director), and Jason Steiner (sales person), delineating that DEFENDANT MILIANO was stealing employee wages, and as a consequence something had to be done to remedy the theft. Mr. Dayekh felt compelled to blow the whistle at this point because DEFENDANT JAMES, the highest authority at the dealership, was refusing to take any corrective action and was interacting with DEFENDANT MILIANO as though nothing untoward had occurred. The anonymous email stated the following:

> **"TO WHOM IT MAY CONCERN. THIS SITUATION HAS GONE TOO FAR!!! THE SALES MANAGER OF THE NEW CARS DEPARMENT AT LEXUS OF CONCORD HAS BEEN TURNING IN COMMISSION VOUCHERS FOR THE SALES PEOPLE THAT ARE INCORRECT.**
> **HE GIVES US CASH FOR AN AMOUNT, BUT TURNS IN A VOUCHER FOR MORE CASH AMOUNT THAN WHAT HE PAID OUT WITH A DIFFERENT SIGNATURE.**
> **ONE OF US GOT <u>THREATENED</u> THAT HE WILL LOSE HIS JOB IF HE COMES FORWARD AND EXPOSES THE NEW CAR SALES MANAGER.**
> **NOW MORE THAN 4 PEOPLE HAVE BEEN <u>VICTIMS</u> OF THIS ACT, AND THEY ARE AFRAID TO COME OUT AND SAY SOMETHING.**
> **WE NEED YOUR HELP TO YOUR HELP TO RESOLVE THIS AND WHEN YOU FIND OUT THAT THIS IS TRUE, A TERMINATION SHOULD TAKE PLACE FOR THE PERSON THAT IS COMITING [SIC] THIS ACT.**
> **IF IT IS NOT RESOLVED ASAP THE NEXT STEP WOULD BE TO INFORM THE OWNER AND THE LEGAL AUTHORITIES TO GE THE MONEY WE EARNED BACK.**

**THIS IS CALLED "THEFT" AND IT IS NOT ACCEPTABLE AT ALL**

75.     DEFENDANT MILIANO discovered that the email had been sent and was crazed with fury, trying to find out who had publicly exposed him and who had sent this email.

***Violence and Threats of Violence in Workplace***

76.     DEFENDANT MILIANO first interrogated Mr. Brock about the email. He threatened to kill the person who had sent the email and exposed his conduct.  He threatened that if it was Mr. Brock who sent the email, he would kill him and his family.

77.     DEFENDANT MILIANO then angrily stormed into Mr. Dayekh's office, shouting that Mr. Dayekh had sent the email and that Mr. Dayekh was trying to get him fired. Mr. Dayekh told DEFENDANT MILIANO, "I don't know what you are talking about, whatever you have done is your problem." DEFENDANT MILIANO responded: "I will kill you if I find out that it was you, and if I lose my job I will hurt you so bad and your family, too. I will hunt you and kill you. Greg will never fire me because of this email."

78.     Mr. Dayekh, in utter fear for his and his family's life, stated, "I have nothing to do with whatever you have done, I got the same email like everyone else." DEFENDANT MILIANO responded: "Someone is trying to get me fired and I will find out and I will kill him, I will hurt whoever did this." DEFENDANT MILIANO, was in a "state of rage and out of his mind", assuring Mr. Dayekh that he was going to kill him, his wife and his children.

79.     DEFENDANT MILIANO then went back to Mr. Brock's office and told him that there was no way he would lose his job; that DEFENDANT JAMES would never fire him. DEFENDANT MILIANO then threatened Mr. Dayekh by stating "I will kill Kimo."

80.     Mr. Dayekh, deeply afraid, reported DEFENDANT MILIANO's death threats to DEFENDANT JAMES, indicating that he was going to file a police report because he feared the

death threats to him and his family. DEFENDANT JAMES replied, "Don't go to the police. I will handle it tomorrow."

81.     Mr. Dayekh's shift ended about 9:30pm and as he was driving home, he was constantly looking into his rear view mirror to see if DEFENDANT MILIANO was following him. That night was a complete nightmare for Mr. Dayekh. His fear grew throughout the night, but he did not dare tell his wife because he feared for her physical and mental health because she is pregnant and due in July 2014.

82.     On or about March 14, 2014, when Mr. Dayekh arrived at work in the morning, DEFENDANT JAMES summoned him to his office. Mr. Dayekh again informed DEFENDANT JAMES that DEFENDANT MILIANO had threatened to kill him and his family and that he was afraid for his and his family's life. DEFENDANT JAMES responded with: "Ok."  Mr. Dayekh further informed DEFENDANT JAMES that DEFENDANT MILIANO had been stealing money from the sales people and Mr. Brock. DEFENDANT JAMES responded, "There was no proof of anything." Mr. Dayekh questioned what had happened with the vouchers which were not signed by the sales people, and DEFENDANT JAMES answered that he did an audit and found out that "75% of the vouchers were ok, and nothing is going on."

83.     DEFENDANT JAMES added, "I can't fire him right now."  Mr. Dayekh then proceeded to tell DEFENDANT JAMES once more that he was scared and needed to report the death threats to the police. DEFENDANT JAMES responded,  "If you do that, that would be so stupid of you and this way you will not cover my back, I am about to become a partner with Mr. Hank Torian, and I don't want Mr. Torian to find out about this right now." Mr. Dayekh retorted, "Then you agree that Patrick did something wrong." Greg admitted, "it looks like he did something, but I have no proof. I will wait until I become a partner, then I will find a reason to

31
COMPLAINT

fire him." Then DEFENDANT JAMES pulled out his phone and read a text to Mr. Dayekh, stating that "The package for the partnership has arrived and everything is going fine." At his wit's end, Mr. Dayekh replied, "Greg, Patrick has threatened my life and my family's lives; do you understand what that means?" DEFENDANT JAMES responded, "Do you feel threatened by Patrick?" "Yes," Mr. Dayekh firmly responded.  DEFENDANT JAMES said, "Ok, I will handle it."

84.     After this discussion, DEFENDANT JAMES did not act. He continued to force Mr. Dayekh to work with DEFENDANT MILIANO in an unsafe, hostile work environment, knowing that DEFENDANT MILIANO had threatened not only Mr. Dayekh's life and his family's life, but also Mr. Brock and his family.

85.     On or about April 5, 2014, Mr. Dayekh's wife received a phone call from a restricted number around 7:16pm. When she answered the phone, a woman with a Spanish accent told his wife that she wanted to talk to Mr. Dayekh. Mr. Dayekh's wife asked who she was speaking with. The woman on the phone said "I can't tell you, is Kimo there, let me speak to him." Then the lady asked Mr. Dayekh's wife, "Who is this anyway?" Mr. Dayekh's wife responded, "I am his wife, who is calling?" The lady then said, "I told you, I can't tell you, oh my God he is married, I can't believe that. I just had dinner with him last night and he is such a playboy." Mr. Dayekh's wife told her, "If you have his number, why are you calling me?" The lady replied, "I got your number from his phone." Mr. Daykeh's wife responded, "If you did, why are you calling me anyway?" Then the woman told Mr. Dayekh's wife: "I had sex with your husband and it was good." Mr. Dayekh's wife replied, "If you call again I will call the cops." Then the woman hung up.

86.     On or about April 10, 2014, Mr. Dayekh went to Business Manager, Chris Carvalho's office around 11:30am and gave her the statement he had circulated via anonymous email, describing the theft of the employees' wages.

87.     On the following day, April 11, 2014, DEFENDANT JAMES sent Sales Manager Efrain Moreno to Mr. Dayekh's office, requesting to talk. Mr. Dayekh went to DEFENDANT JAMES' office, with Mr. Moreno present. DEFENDANT JAMES informed Mr. Dayekh that he was going to fire him and asked him to quit voluntarily. Mr. Dayekh stated, "Why do you want me to lie? You are firing me and you want me to sign a statement that you filled out saying I voluntarily quit." Mr. Dayekh continued: "Enough lies. I will not sign that statement because it is your lie." Then, DEFENDANT JAMES demanded that Mr. Dayekh sign a statement that he had been paid all the dealership owed him. DEFENDANT JAMES then stated, "The reason why I am letting you go is because I had a complaint about you from a customer." Mr. Dayekh asked, "What customer?" DEFENDANT JAMES responded, "The Korean guy." Mr. Dayekh replied, "The Korean customer from about 2 months ago, and you just remembered that now after 2 months?" Mr. Dayekh then requested, "Show me the complaint." DEFENDANT JAMES responded, "I don't have it." Mr. Dayekh said, "I know why you are firing me, it's because I exposed the theft that you covered for Patrick."

88.     DEFENDANTS' convenient excuse for wrongfully terminating Mr. Dayekh's employment on the grounds that a customer had complained is a transparent pretext, through which the true motivating factor of retaliation is abundantly clear. This truth is highlighted by the fact that Mr. Dayekh was the top producer for his two (2) years at the dealership. No finance manager or finance director ever produced as much profit as he did in the history of Lexus of

Concord. Mr. Dayekh was producing profits every month consistently. No finance manager has ever come close to his production.

89.    While Mr. Dayekh was driving home, about 12 minutes after he had been fired, he received a phone call from a restricted number. On a hunch, he answered the phone.  It was DEFENDANT MILIANO.  He was laughing, and stated, "How does it feel you little fucker? Enjoy it, you just got fired you mother fucker!!" Mr. Dayekh responded, "No problem. At least I am not a thief! By the way I will report you to the police." DEFENDANT MILIANO hung up.

90.    In his own words, Mr. Dayekh describes the emotional and physical misery he endures every day as a result of DEFENDANTS' illegal conduct. "Since this whole drama started, my life at home has gone upside down. My wife is pregnant. The death threats and losing my job has caused my wife a great deal of stress. She is pregnant and does not need any more stress than what she is going through. The threats from Patrick and the unsafe environment that Greg James put me through and put my family at harm, all this was unacceptable. I don't sleep well, because every time I hear a noise outside the house I am up scared for my kids and for my life.  I have a 2 year old baby daughter, and 2 boys 15 and 17 at home. I had to buy extra locks for every door at home. I watch my back where ever I go. I count the minutes for my kids to come home, and when my wife goes out to the store. I hear the sound of a bullet every day. I leave the house thinking that I will be dead any minute. I have nightmares because of all this drama. I hear Patrick's sound and see Greg's face haunting me every day. My wife does not want to live in the same house and wants to move out of the State because of all this stress and all this drama. Some times when I am walking in the street, I feel that I will get hit by a car driven by Patrick. I am the head of my house and the only income that provides for my family. I feel that I need to see a doctor to get medication to relax me, so I can sleep. I am so stressed out. My wife suffers more

pain every day because of the stress Greg James and Patrick Miliano have put my family through. She feels most of the time that she is going to give birth early even though she is due in July 2014.  All that is due to the stress she has to go through."

91.     Mr. Dayekh has filed a police report against DEFENDANT MILIANO at the Concord Police Department on April 17, 2014. Mr. Dayekh has contemporaneously filed for a Restraining Order against DEFENDANT MILIANO.

## HOSTILE WORK ENVIRONMENT

92.     DEFENDANT MILIANO regularly and freely spouted and repeated highly offensive comments when referring to customers and employees as "Fish-heads", "Niggers", "Dog-eaters", "Towel-heads", "Faggots," "Cunt", "Bitches", to cite a few.  Mr. Dayekh repeatedly objected to these offensive comments and complained to DEEFENDANT MILIANO and DEFENDANT JAMES. Mr. Dayekh observed and heard DEFENDANT MILIANO call Ms. Denton various derogatory comments such as "Skanky hoe", "Bitch", "Cunt", and other expressions. Mr. Dayekh regularly overheard DEFENDANT MILIANO yell, scream, and use gender based epithets such as bitch, cunt, skanky hoe, towards Ms. Denton. On one occasion, Mr. Dayekh intervened and complained to DEFENDANT MILIANO that he should not use such language toward Ms. Denton.

93.     When learning that DEFENDANTS were going to fire or had fired Ms. Denton, Mr. Brock, Mr. Dayekh and other employees complained to DEFENDANT JAMES and DEFENDANT MILIANO that it was unfair and wrong to terminate Ms. Denton as she was one of the top performers.

## PLAINTIFF MS. AMANDA BO DENTON

## DEFENDANTS' RETALIATION FOR PROTECTED ACTIVITY

***Theft of Employees' Earnings by Fraudulent Inflation of Employees' Taxable Wages***

94.   PLAINTIFF Ms. Denton was a loyal employee of DEFENDANT LEXUS OF CONCORD and was employed by DEFENDANTS as a salesperson. Her job once was both rewarding and fulfilling. However, during her employment, the hostility directed toward Ms. Denton in the work environment mounted to an escalating, intolerable level because she engaged in statutory protected activity. As a result of Ms. Denton engaging in protected activity by complaining about the theft of employees' wages, discrimination, and a hostile work environment, DEFENDANTS wrongfully terminated her employment.

95.   After leaving Cumberland University with a Bachelor's degree in English, Ms. Denton went to Active Duty for the United States Navy. She went to Great Lakes Naval Station where she enrolled in the Naval Hospital Corpsman School. After completing her University education, Ms. Denton was ordered to the USS Comstock 45 in San Diego, California. Immediately upon arrival in San Diego, Ms. Denton left four (4) days later on a plane to meet her ship on deployment. Ms. Denton was flown to Bahrain and then was boated out on the USS Kitty Hawk to the USS Comstock. From there Ms. Denton began ship life and visited over twenty (20) countries. While on deployment she wrote articles that were published in the Navy Times.

96.   When Ms. Denton returned to Tennessee from her time in the Navy and began working at a car dealership, Ms. Denton became the top performer at her dealership within three 3 years. She was advanced to the management program because of her outstanding performance and received a job offer to move to San Francisco as a Business Development Coordinator and Internet Director. About a month after moving to San Francisco in May of 2013, DEFENDANT MILIANO and Ms. Denton became acquaintances. DEFENDANT MILIANO started talking to Ms. Denton about advancing her career, telling her she needed to work for a high line dealership.

DEFENDANT MILIANO offered Ms. Denton a job at Lexus of Concord. DEFENDANT MILIANO, over a period of three (3) weekends, persistently encouraged Ms. Denton to come to work for him at Lexus of Concord.  Finally, at the end of July, 2013, Ms. Denton agreed and accepted DEFENDANT MILIANO's offer and was hired at Lexus of Concord. Ms. Denton was appreciative of DEFENDANT MILIANO hiring her as salesperson, but she made it clear to him that she would not have any sort of relationship with him, other than friendship.

97.     DEFENDANT MILIANO and Ms. Denton became close friends. DEFENDANT MILIANO had to have surgery in September 2013. Ms. Denton called him every day to check on his well-being. While he was recuperating from his surgery, he informed Ms. Denton that his toilet had overflowed and water was everywhere. As a good friend would, Ms. Denton drove to DEFENDANT MILIANO's home with cleaning supplies and cleaned the mess caused by overflowing toilet. She also stayed to take care of him.

**HARRASSMENT/HOSTILE WORK ENVIRONMENT**

98.     The harassment from DEFENDANT MILIANO started shortly after DEFENDANT MILIANO returned to work at the end of September. DEFENDANT MILIANO had previously attempted to date Ms. Denton, but Ms. Denton rebuffed his attempt. Ms. Denton refused any advances or requests to come over to his residence, other than when she helped him after his surgery. Angry about being rebuffed, DEFENDANT MILIANO started rumors at work by telling Frank Ulbaldo and suggesting to Jason Pruitt that he had sexual intercourse with her. Ms. Denton became aware of the rumor during the second week of October 2013, when she overheard Jason Pruitt discussing it outside of the used car department. Ms. Denton confronted DEFENDANT MILIANO, insisting that he immediately stop the false rumors. Following this incident, DEFENDANT MILIANO, on numerous occasions, belligerently screamed and yelled

not only at Ms. Denton but numerous other employees, telling them, "Pack your shit and leave if you don't like it.  My job is to torture you! Get the fuck out of my office."

99.     DEFENDANT MILIANO routinely, pervasively and continuously made racial, gender, and homophobic offensive comments. DEFENDANT MILIANO would regularly and freely use and repeat such offensive comments when referring to customers and employees as "fish-heads", "Niggers", "dog-eaters", and "towel-heads", "Faggots," "Cunt", "Bitches", to cite a few. Ms. Denton repeatedly objected to these offensive comments and complained to DEFENDANT MILIANO AND DEFENDANT JAMES in efforts to get DEFENDANT MILIANO to stop using these comments.  She expressly explained to DEFENDANT MILIANO that she was offended by these comments because she was half Asian and did not appreciate any of the comments, including the reference to Asians as dog eaters and fish-heads. Ms. Denton also complained that she was offended by his derogatory references to women. DEFENDANT MILIANO's unwelcomed and hurtful hostile comments continued unabated. DEFENDANT JAMES refused to take any corrective action to stop DEFENDANT MILIANO from engaging in comments which altered, affected, and permeated the work environment with hostility.

100.     Ms. Denton complained to DEFENDANT JAMES at least on five (5) different occasions that DEFENDANT MILIANO was calling her "a fucking cunt" and/or "bitch".  DEFENDANT JAMES failed to take any corrective action. Ms. Denton also repeatedly told DEFENDANT MILIANO that he could not talk to her in that offensive manner. On one occasion near the end of August 2013, DEFENDANT MILIANO was referring to an Asian customer as "fish eater". When Ms. Denton objected, DEFENDANT MILIANO asked, "Are you a fucking chink?" She responded by explaining that her mother is Thai and that she did not appreciate these racist comments. In September 2013, DEFENDANT JAMES was present when DEFENDANT

MILIANO referred to Ms. Denton as a "Fucking Cunt", and "Fucking bitch." When Ms. Denton turned to DEFENDANT JAMES, asking for intervention and protection, DEFENDANT JAMES simply said, "I will talk to him."

101.    Ms. Denton complained about and objected to DEFENDANT MILIANO'S oppressive, abusive treatment of one African employee to whom DEFENDANT MILIANO frequently referred to as "Dumb Nigger", "Bitch", and "Faggot." Another employee of Dominican descent was also a target of DEFENDANT MILIANO's verbal and offensive abuse, including such comments as "Bitch", "Faggot".

102.    In November, 2013, Ms. Denton had requested time off to go home to Tennessee to handle personal matters. Ms. Denton also requested two (2) Sundays off, one in January and one in February, to handle business concerning her military status. DEFENDANT MILIANO and DEFENDANT JAMES both were present and approved this requested time off. Around November 2013, Ms. DENTON noticed that her Spiff wages were short. This occurred regularly, causing her to complain at least twice a month to DEFENDANT MILIANO and two or three times to DEFENDANT JAMES about her earned and unpaid Spiff wages. Ms. Denton complained to DEFENDANT MILIANO on numerous occasions, telling him that her pay and Spiff money was not correct and was short. DEFENDANT JAMES failed to take any corrective and remedial action. DEFENDANT MILIANO responded to complaints regarding her Spiff with, "I take care of the ones I like." Due to threats and harassment, Ms. Denton went to DEFENDANT JAMES on January 10th, 2014. JAMES simply said he would handle it.

103.    DEFENDANT MILIANO continued to treat Ms. Denton unfairly by holding her Spiff money and refusing to assist her with duties that required his assistance for her to perform her job. He also told Ms. Denton that he wanted to fire her and "blow [her] out." On or about

February 16, 2014, Ms. Denton took off the requested and approved days. On February 17, 2014 DEFENDANT MILIANO pulled Ms. Denton into his office with Manager Efrain and locked the door. DEFENDANT MILIANO told Ms. Denton that he was writing her up for taking the days off which he and DEFENDANT JAMES had approved. Ms. Denton exclaimed that she felt uncomfortable being locked in his office and asked to leave. DEFENDANT MILIANO answered, "Go home." Ms. Denton left the office and went to HR to see Dori Sosa, the HR manager, to file an HR harassment complaint against DEFENDANT MILIANO.

104.     HR manager Dori Sosa gave Ms. Denton a number to call, but she did not know the procedure for filing a harassment complaint. Ms. Denton went back to DEFENDANT MILIANO's office and asked him for the paper she needed to sign for the write-up and for the suspension by DEFENDANT MILIANO. DEFENDANT MILIANO said he was not suspending her. Ms. Denton replied that she was leaving per his instructions. DEFENDANT MILIANO asserted, "If you leave, it would be job abandonment." Ms. Denton repeated his statement to her that she should leave and go home. DEFENDANT MILIANO then said, "Go home and don't return." Ms. Denton left and texted DEFENDANT JAMES, saying, "Hi this is Amanda, I just wanted you to know that I went home because Patrick sent me home."

105.     Ms. Denton did not want DEFENDANT JAMES to think that she was abandoning her job, as DEFENDANT MILIANO had accused her. DEFENDANT JAMES called Ms. Denton and told her to be at work the next morning, and they would talk about it. On or about February 18, 2014, Ms. Denton met with DEFENDANT JAMES and expressed that it was unfair for her to be harassed by DEFENDANT MILIANO when she was a top performer and was always on time. DEFENDANT JAMES told Ms. Denton, "Stay away from Patrick and I will handle it." DEFENDANT JAMES also stated to her that her job was not in jeopardy. DEFENDANT

40
COMPLAINT

JAMES added that from now on, Ms. Denton should request days off from him or other managers and not to tell DEFENDANT MILIANO why she was taking the days off. DEFENDANT JAMES also told Ms. Denton "Not to worry about bringing in paperwork on why she was requesting time off."

106.    On or about February 25, 2014, Ms. Denton came to work, and DEFENDANT MILIANO fired her for failure to bring verification of why she was absent on February 16th. DEFENDANT MILIANO also refused to pay Ms. Denton her earned wages, stating, "I terminated you on February 26, 2014." However, Ms. Denton was not terminated until February 28th, 2014. Ms. Denton worked on February 26, 2014 and February 27, 2014.

107.    On April 21, 2014, Ms. Denton filed a complaint with the EEOC and DFEH.  In March 2014, DEFENDANT JAMES called Ms. Denton and requested a meeting. During this meeting, DEFENDANT JAMES promised to reinstate Ms. Denton. To date, DEFENDANT JAMES has failed to honor his promise.

**PLAINTIFF MR. CHRISTOPHER MONTOYA**

**DEFENDANTS' RETALIATION FOR PROTECTED ACTIVITY**

***Theft of Employees' Earnings by Fraudulent Inflation of Employees' Taxable Wages***

108.    PLAINTIFF Mr. Montoya was a loyal LEXUS employee for almost nine (9) years and was employed with DEFENDANT LEXUS OF CONCORD from June 2012 until October 2013. He was enthusiastic about his job as a Salesman, took pride in doing it well, and his job once was both rewarding and fulfilling. However, during his time of employment at DEFENDANT LEXUS OF CONCORD, the hostility directed toward Mr. Montoya in the work environment mounted to an escalating, intolerable level because he engaged in statutory protected activity.

109.    During the last few months of his employment with DEFENDANT LEXUS OF CONCORD, Mr. Montoya became aware that his paychecks were becoming smaller and that there were unexplained discrepancies in his Spiff wages. The weekend pyramid had just been implemented in August or September 2013, and he assumed that he was just reading his paychecks wrong. He found it very difficult to ask for an accounting or any explanations from DEFENDANT MILIANO because the DEFENDANT did not provide records when asked for them.

**HARRASSMENT/HOSTILE WORK ENVIRONMENT**

110.    Throughout his employment at DEFENDANT LEXUS OF CONCORD Mr. Montoya personally experienced and observed many instances of DEFENDANT MILIANO regularly and freely spouting and repeating highly offensive comments when referring to customers and employees as "Fish-heads", "Niggers", "Dog-eaters",   "Towel-heads", "Faggots," "Cunt", "Bitches", to cite a few.

111.    Every day of going to work, especially during the last six months of his employment with DEFENDANT LEXUS OF CONCORD, became an ordeal for Mr. Montoya because he had to worry about being mistreated and abused by DEFENDANT MILIANO and DEFENDANT JAMES. Both of them sat off to the side, watching while he and the other salesmen worked, laughing and making offensive remarks. DEFENDANT MILIANO had a fascination with talking about Penises, and constantly made derogatory remarks about Asians, calling them fish heads, cyborgs or other remarks. He also made remarks about gays, and made disgusting remarks about women, calling them cunts, whores, bitches and other offensive names. Mr. Montoya heard him call an African employee, Mr. Abuke, a "nigger" and a "silverback gorilla" on frequent occasions. He called Indians "towelheads" and "red dotters".

112.    DEFENDANT MILIANO singled out Mr. Montoya and Mr. Woo in particular, calling Mr. Woo a cyborg, homo, faggot or little bitch. He taunted Mr. Montoya and Mr. Woo, calling them "little Pecker", unzipping his pants, sticking his hand in and wiggling his finger through the open front, laughing that they had little penises. He made fun of Mr. Montoya because he has five children, belittling him constantly. When Mr. Montoya asked DEFENDANT JAMES about the shortages in his pay check, JAMES belligerently responded that it was not his fault that Mr. Montoya had so many kids and had to pay high taxes. DEFENDANT MILIANO called Mr. Montoya, who is Mexican-American, a spic, a beaner, faggot, little bitch and other offensive names. This happened virtually every day, and during the last six months of his employment he became so anxious and distraught that he hardly slept at night. He did not want to have sexual relations with his wife, did not play with his kids, but went home from work and went to bed, completely miserable. He dreaded every day and felt humiliated and diminished all the time.

113.    He confided in Mr. Brock a couple of times, but Mr. Brock was powerless to change anything because the General Manager, DEFENDANT JAMES, protected DEFENDANT MILIANO and participated in the degrading behavior. He and DEFENDANT MILIANO sat together and laughed at the sales people, and they were buddies. It was clear to everyone at the dealership that the employees had no recourse because DEFENDANT JAMES did nothing to protect anyone from DEFENDANT MILIANO'S rage and vicious attacks.

114.    The previous Sales Manager, Mr. Clarkson, told Mr. Montoya that DEFENDANT JAMES had told him to "torture them, I want to see fear in their eyes", referring to the salespeople. DEFENDANT JAMES and DEFENDANT MILIANO constantly threatened Mr. Montoya and other salespeople with firing them, and Mr. Montoya and others lived in constant anxiety and fear.

115. Mr. Montoya's work and income became severely affected and his income dropped because when he had customers, DEFENDANT MILIANO did not take his deals, but crumpled up offers and threw them at Mr. Montoya, yelling, "Tell 'em to buy a car somewhere else, tell 'em to get the fuck out." MILIANO called customers a "piece of shit," and depending on their ethnicity, niggers or towelheads or fish heads, gooks, cyborgs, and more. Every time Mr. Montoya walked into the manager's office, DEFENDANT MILIANO and DEFENDANT JAMES seemed to be there together, and the conversation was only "fuck…, fuck… fuck…" It became so intolerable that Mr. Montoya refused to go into the office after DEFENDANT JAMES cursed him viciously in front of Mr. Lao and DEFENDANT MILIANO.

116. DEFENDANT MILIANO told Mr. Montoya on several occasions about owning many guns, knives and swords. He constantly threatened to "kick your ass," "take care of business", claimed he was an MMA fighter, and he even had weapons as his screensaver. Mr. Montoya became so scared that he did not even try to complain or object any more. Mr. Montoya asserts, "If you see Patrick, run!"

117. Mr. Montoya also witnessed DEFENDANT MILIANO'S violently abusive behavior towards Ms. Denton. He called her many vile names, such as bitch, whore, and cunt.

118. DEFENDANTS MILIANO and JAMES engaged in such continuous abusive and humiliating conduct, including racist and violent remarks directed towards Mr. Montoya, Latinos, and other racial minorities, as well as women, that Mr. Montoya finally was compelled and did quit his job, to save his sanity and self-respect. Any reasonable salesperson of Latino descent would have felt compelled to extricate him-or herself from the abusive and hostile work environment by quitting.

**PLAINTIFF MR. WILSON WOO**

44
COMPLAINT

**DEFENDANTS' RETALIATION FOR PROTECTED ACTIVITY**

***Theft of Employees' Earnings by Fraudulent Inflation of Employees' Taxable Wages***

119.    PLAINTIFF Mr. Woo was a loyal employee of DEFENDANT LEXUS OF CONCORD and was employed by DEFENDANTS from November 29, 2012 until October 8, 2013. Mr. Woo was enthusiastic about his job as a salesperson, and his job once was both rewarding and fulfilling. However, during his time of employment at DEFENDANT LEXUS OF CONCORD, the hostility directed toward Mr. Woo in the work environment mounted to an escalating, intolerable level because he engaged in statutory protected activity.

120.    Beginning in February 2013, Mr. Woo had continuous problems with discrepancies in his commission payout and repeated delays in getting paid the correct amounts. In these cases he had to wait a whole month to be paid his pay. At least twice or more he received Spiff money without signing or receiving a voucher, and he had no way to determine whether the amounts on the vouchers were accurate and correct. He repeatedly requested records to verify the correct wages, but DEFENDANT MILIANO and HR repeatedly failed to provide records of his correct wages for his review.

**HARRASSMENT/HOSTILE WORK ENVIRONMENT**

121.    Throughout his employment at DEFENDANT LEXUS OF CONCORD Mr. Woo experienced and observed many instances of DEFENDANT MILIANO regularly and freely spouting and repeating highly offensive comments when referring to customers and employees as "Fish-heads", "Niggers", "Dog-eaters",  "Towel-heads", "Faggots," "Cunt", "Bitches", to cite a few.

122.    Every day of going to work became an ordeal for Mr. Woo because he had to worry about being mistreated and abused by DEFENDANT MILIANO and DEFENDANT JAMES.

45

COMPLAINT

Both of them sat off to the side, watching while he tried to work, and making offensive remarks. DEFENDANT MILIANO had a fascination with talking about Penises, and constantly made derogatory remarks about Asians calling them fish heads, cyborgs or other remarks. He also made remarks about gays, and made disgusting remarks about women.

123. One day Mr. Woo was working a deal to sell a car to an Asian customer, and the customer offered a low price, so Mr. Woo took the written offer to DEFENDANT MILIANO, who became irate. He crumpled up the offer, threw the paper at Mr. Woo and yelled, "I will not sell those Gooks a car. Tell them to leave!" The General Manager, DEFENDANT JAMES, was laughing the entire time. Mr. Woo was deeply shocked and upset and left the office, not daring to speak up against their rudeness.

124. At other times, DEFENDANT MILIANO threatened to "kick your butt", referring to Mr. Woo, and offered to "put money on it" in front of everyone in the office, humiliating and intimidating Mr. Woo. DEFENDANT MILIANO constantly talked about his guns and swords, and spent considerable time at work on the internet, buying weapons and discussing his gun purchases openly in the office. This was intimidating to Mr. Woo, and other similarly situated employees.

125. DEFENDANT MILIANO continuously mistreated and abused Mr. Woo and other salespeople. Mr. Woo tried to speak up about the constant abuse, but DEFENDANT JAMES, the General Manager, participated in and laughed about the derogatory remarks and the abuse inflicted on employees by DEFENDANT MILIANO. Therefore Mr. Woo felt helpless to go anywhere to get help.

126. Mr. Woo also witnessed DEFENDANT MILIANO'S abusive behavior towards Ms. Denton. He called her many vile names, such as bitch, whore, rat and cunt.

127.    DEFENDANTS MILIANO and JAMES engaged in such continuous abusive and humiliating conduct, including racist and violent remarks directed towards Mr. Woo, Asians, and other racial minorities, as well as women, that Mr. Woo finally was compelled and did quit his job.  Any reasonable salesperson of Asian descent would have felt compelled to extricate him-or herself from the abusive and hostile work environment by quitting.

## PLAINTIFF MR. FRANCISCO UBALDO

## DEFENDANTS' RETALIATION FOR PROTECTED ACTIVITY

### *Theft of Employees' Earnings by Fraudulent Inflation of Employees' Taxable Wages*

128.    PLAINTIFF Mr. Ubaldo has been a loyal LEXUS employee for more than twenty (20) years, working for several dealers, and was employed with DEFENDANT LEXUS OF CONCORD from September 2011 until January 2014. He was always enthusiastic about his job as a Salesman, took pride in doing it well, and his job has always been both rewarding and fulfilling. However, during his time of employment at DEFENDANT LEXUS OF CONCORD, the hostility directed toward Mr. Ubaldo in the work environment mounted to an escalating, intolerable level because he engaged in statutory protected activity. In his words: "I have never experienced anything like this abuse anywhere."

129.    Beginning in November 2013, Mr. Ubaldo noticed that his cash Spiffs and vouchers did not add up correctly. He received a cash-Spiff wage for $460 and signed a voucher for that amount. Then he noticed in his "Washout Pay" (final monthly pay after adjusting draws, salaries and commissions), that there were two vouchers noted for $460, and taxes had been taken out for both. Mr. Ubaldo questioned DEFENDANT MILIANO about the discrepancy and his lower paycheck because of the higher taxes, and DEFENDANT MILIANO responded, "You get lots of money, why are you questioning this, you just miscalculated. Mr. Ubaldo noticed another

47
COMPLAINT

voucher discrepancy in December. He is now investigating the months before November 2013, and January 2014, his last paycheck.

130.    In addition to the fraudulent Spiff vouchers, Mr. Ubaldo had trouble almost every week in getting the cash owed to him. One week he was owed $1,400, and DEFENDANT MILIANO just said, "I'm out of money, you have to wait until next week." This happened several times. He eventually received the money owed, but much delayed, and he felt humiliated that he kept having to beg for money he had earned.

131.    During one Saturday morning meeting, Mr. Ubaldo asked why people were getting paid their Spiff wages weeks late, and DEFENDANT JAMES yelled, "You get it when you get it."

**HARRASSMENT/HOSTILE WORK ENVIRONMENT**

132.    Throughout his employment at DEFENDANT LEXUS OF CONCORD Mr. Ubaldo experienced and observed many instances of DEFENDANT MILIANO regularly and freely spouting and repeating highly offensive comments when referring to customers and employees as "Fish-heads", "Cyborgs", "Chinks", "Niggers", "Dog-eaters",  "Towel-heads", "Faggots," "Homo". "Wetbacks," "Spics", "Cunt", "Bitches", to cite a few.

133.    DEFENDANT MILIANO called Mr. Ubaldo, who is Dominican-American of African descent, Nigger on many occasions, also Coon, Faggot and Homo. In addition, he constantly told Mr. Ubaldo that he was too old , that he'd never get another job anywhere, that he was an old Geezer, that he could beat him up, and to "Eat my dickhole". In all of his years of working, Mr. Ubaldo has never been so humiliated and disrespected.

134.    Mr. Ubaldo was a top producer and very good at his job, but DEFENDANT JAMES and DEFENDANT MILIANO showed him the door almost every week, threatening to fire him. DEFENDANT JAMES condoned and supported every racist, discriminatory and retaliatory act

DEFENDANT MILIANO committed, and it was DEFENDANT JAMES' directive that "I'm here to torture you."

135.    Mr. Ubaldo tried to complain and to speak up for others, but when anyone did so, DEFENDANTS JAMES and MILIANO would kill their car deals, including Mr. Ubaldo's. Mr. Ubaldo saw DEFENDANT MILIANO ripping up offers and other documents and telling customers to get out, even threatening them. DEFENDANT MILIANO did not help with deals, did not support the salespeople, and often he and DEFENDANT JAMES left the dealership to go shopping, leaving the dealership without management to okay deals. Often Mr. Brock had to do DEFENDANT MILIANO'S work.

136.    Finally Mr. Ubaldo went into DEFENDANT JAMES' office and told him, "You are in violation of labor laws. There are laws to protect me. I will not take this abuse any longer. You need to do something about this." DEFENDANT JAMES yelled at Mr. Ubaldo to get out, to leave. He said, "Patrick is your boss, get out." Mr. Ubaldo stopped trying to complain, but he became so anxious and upset that his business went down and he constantly felt threatened by DEFENDANTS JAMES and MILIANO.

137.    DEFENDANT MILIANO was particularly vicious towards Ms. Denton. He really persecuted her and called her every possible derogatory name, such as hooker, rat, cunt, bitch, whore and others. Mr. Ubaldo befriended her and tried to protect her from the abuse, but DEFENDANT MILIANO was in a rage every time her name was mentioned.

138.    DEFENDANTS MILIANO and JAMES engaged in such continuous abusive and humiliating conduct, including racist and violent remarks directed towards Mr. Ubaldo, Latinos, and other racial minorities, as well as women, that Mr. Ubaldo finally was compelled and did quit his job, to save his sanity and self-respect.  Any reasonable salesperson of African or any

other ethnic descent would have felt compelled to extricate him-or herself from the abusive and hostile work environment by quitting.

## FIRST CAUSE OF ACTION
### FEDERAL FAIR STANDARD LABOR ACT:
### FAILURE TO KEEP ACCURATE WAGE RECORDS
(Against Defendant Employer)

139.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

140.    DEFENDANTS violated Fair Labor Standards Act §§ 11(c), 15(a)(5) by failing to keep adequate and accurate records of wages earned by the salespeople. Section 11(c) of the FLSA provides that "every employer covered by the Act: shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder." Section 15(a)(3) of the FLSA states that it is a violation for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." Employees are protected regardless of whether the complaint is made orally or in writing. Complaints made to the Wage and Hour Division are protected, and most courts have ruled that internal complaints to an employer are also protected. Because section 15(a)(3) prohibits "any person" from retaliating against "any employee", the protection applies to all employees of an employer even in those instances in which the employee's work and the employer are not covered by the FLSA.

141.    DEFENDANTS, and each of them, failed to correctly pay PLAINTIFFS their earned Spiff wages, which were due, earned, and owing. DEFENDANTS failed to maintain adequate records, and failed to provide PLAINTIFFS with records verifying the accuracy of their Spiff wages. DEFENDANTS obstructed, delayed and failed to provide employment records, which would enable PLAINTIFFS to verify DEFENDANTS' calculations of PLAINTIFFS' earned Spiff wages, prompting PLAINTIFF Lao to state that obtaining records from DEFENDANTS' HR was "Like pulling teeth."

142.    As a direct and legal result of DEFENDANTS' conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

143.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

        Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## SECOND CAUSE OF ACTION
CALIFORNIA LABOR CODE SECTION 1102.5 VIOLATIONS
(Against Defendant Employer)

144.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

51
COMPLAINT

145.    DEFENDANTS, and each of them, took adverse employment action against PLAINTIFFS in violation of California Labor Code Section 1102.5 by retaliating against PLAINTIFFS for engaging in statutorily protected activity. PLAINTIFFS' protected activity included, but is not limited to, the following: DEFENDANTS failing to pay correct wages earned; requiring employees to pay state and federal income taxes on inflated wages which were not paid to employees; retaliating against employees, including failure to promote and wrongful termination because employees engaged in protected, including "Whistleblowing" against illegal activity of withholding wages earned, and complaining against a hostile work environment directed towards employees and customers of LEXUS OF CONCORD. This hostile environment included managers referring to racial minorities and women in vile epithets such as "Fish Eaters",  "Turban Heads", "Niggers" , "Cunts", "Whores" "Skanky Hoes", just to cite a few; threatening violence against employees, including threats to kill employees, their wives, and their children; bringing, keeping, and maintaining guns and swords in the work place; Conspiring to, embezzling and converting PLAINTIFFS' earned wages; engaging in a pattern and practice of failing to keep adequate and accurate payroll records; failing to accurately pay earned wages and converting employees' wages.

146.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

147.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below

### THIRD CAUSE OF ACTION
WRONGFUL TERMINATION
(Against Defendant Employer)
(As to Plaintiffs Denton and Dayekh)

148.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

149.    DEFENDANTS wrongfully and retaliatorily terminated the employment of PLAINTIFFS Ms. Denton and Mr. Dayekh in violation of public policy. DEFENDANTS terminated the employment of Ms. Denton and Mr. Dayekh because they complained about the illegal withholding of employees' wages and against the hostile work environment which DEFENDANTS actively maintained. Title VII, the 1964 Civil Rights Act, as Amended, and the California Fair Employment Housing Act and the California Labor Code expressly enumerates the public policy that employees have a right to work in environment free of discrimination and that employees are entitled to wages earned.

150.    DEFENDANTS and each of them terminated PLAINTIFFS Ms. Denton's and Mr. Dayekh's employment in violation of these public polices and in violation state and federal law prohibiting the employers from retaliating against employees because employees engaged in protected activities.

53
COMPLAINT

151.     As a direct and legal result of DEFENDANTS' illegal and retaliatory  conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

152.     DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## FOURTH CAUSE OF ACTION
### RETALIATION AND VIOLATION PUBLIC POLICY/TAMENY
(Against Defendant Employer)

153.     PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

154.     DEFENDANTS violated public policy by retaliating against PLAINTIFFS. DEFENDANTS violated public policy by retaliating against Mr. Brock by failing to promote and reducing his responsibilities and terms and conditions of his employment which he had enjoyed prior to participation in protected activity. DEFENDANTS violated public policy against Ms. Denton and Mr. Daykeh by terminating their employment in retaliation for their engagement in protected activity. DEFENDANTS retaliated against Mr. Lao by threatening the termination of

employment if he were to complain and expose the illegal Voucher Scheme creating shortages in his earned wages.

155.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

156.    DEFENDANTS acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below

### FIFTH CAUSE OF ACTION
FRAUD
(Against Defendant Employer)

157.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

158.    DEFENDANTS intentionally misrepresented to PLAINTIFFS the amount of wages PLAINTIFFS had earned. Further, DEFENDANTS falsified and forged employment records intentionally and with knowledge to deceive and deprive PLAINTIFFS of their legitimate earned wages. PLAINTIFFS justifiably relied on DEFENDANTS' fraudulent representation because

DEFENDANTS were their employer. As a result of PLAINTIFFS' justifiable reliance, PLAINTIFFS suffered injuries, losses, and damages.

159.     As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

160.     DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### SIXTH CAUSE OF ACTION
ASSAULT
Against DEFENDANT MILIANO)
(As to Plaintiffs Brock and Dayekh)

161.   PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint though set forth here in full.

162.   DEFENDANT MILIANO made direct death threats to PLAINTIFFS Mr. Brock and Mr. Dayekh, stating that he was going to kill them and their families.

163.    DEFENDANT MILIANO slammed down on Mr. Brock's desk an email while yelling that Mr. Brock had sent the whistleblowing email, exposing DEFENDANT MILIANO'S theft of employees' wages and that he was going to kill Mr. Brock and his family. DEFENDANT MILIANO also stormed into Mr. Dayekh's office, screaming and threatening to kill Mr. Dayekh, his pregnant wife and his children. The PLAINTIFFS reasonably were mortally frightened by DEFENDANT MILIANO's threats because DEFENDANT MILIANO had the ability to carry out the threats. DEFENDANT MILIANO had shown them guns and swords he kept in his office in the workplace.

164.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

165.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

**SEVENTH CAUSE OF ACTION**
WORKPLACE VIOLENCE/THREAT OF VIOLENCE
(Against Defendants Employer and Miliano)

57
COMPLAINT

166.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

167.    DEFENDANT MILIANO's threats to kill PLAINTIFFS Mr. Brock and Mr. Dayekh violated state and federal law regarding employers' duty and obligation to protect employees in the workplace from violence and threats of violence. DEFENDANTS and each of them breached this legal duty by failing to prevent DEFENDANT MILIANO from threatening the lives of PLAINTIFF Mr. Brock, Mr. Dayekh and their families.

168.    As a direct and legal result of DEFENDANTS' illegal and retaliatory  conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

169.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### EIGHTH CAUSE OF ACTION
HOSTILE WORK ENVIRONMENT VIOLATION TITLE VII AND FEHA
(Against Defendants Employer and Miliano)

58
COMPLAINT

170.   PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

171.   PLAINTIFFS were subjected to a hostile work environment. DEFENDANTS, and each of them, maintained a hostile work at the Lexus of Concord dealership. DEFENDANTS caused, permitted, and maintained a hostile and abusive work environment directed at PLAINTIFFS, other similarly situated employees, and customers. The harassing conduct was severe and pervasive. A reasonable employee in PLAINTIFFS' circumstances would have considered the work environment to be hostile and abusive. PLAINTIFFS considered the work environment to be hostile and abusive. DEFENDANTS, supervisors, engaged in the conduct and DEFENDANTS knew or should have known of the offensive and hostile conduct and failed to take immediate and appropriate corrective action.

172.   DEFENDANTS created an intimidating and hostile work environment against PLAINTIFFS by making explicit, offensive, and derogatory remarks directed at women, gays, and racial minorities.  This illegal conduct was a routine and daily practice in the workplace.

173.   DEFENDANTS' offensive, explicit, derogatory, and racist epithets were unwelcomed, hostile and offensive to any reasonable employee. PLAINTIFFS expressed their objections to the hostile conduct. DEFENDANTS failed to take any corrective action to remedy the hostile work environment.

174.   During the past year PLAINTIFFS have observed DEFENDANT MILIANO bring to the workplace at least six (6) guns of various makes and models, plus a large sword. DEFENDANT MILIANO'S obsession with guns in the workplace, coupled with his abusive, humiliating and offensive comments terrified PLAINTIFFS, and other similarly situated employees.

PLAINTIFFS were keenly aware and knew if they didn't go along with everything DEFENDANT MILIANO did or said, they were at risk for losing their jobs or worse. PLAINTIFFS felt compelled to humor DEFENDANT MILIANO, and to go along with whatever conversation he was having whether it was via text or in person. PLAINTIFFS' terms and conditions of employment were pervasively altered because they felt that if they did not blend in with DEFENDANT MILIANO they would be fired, like many others. All objected, none approved of his offensive conduct but were afraid for their jobs. Suffering DEFENDANT MILIANO's hostile conduct and bullying were very mentally draining for PLAINTIFFS and other similarly situated employees. DEFENDANT MILIANO made it very well known to everyone that he was ("IN WITH GREG"), the General Manager, and nobody could touch him. He would brag about "going to sporting events with Greg and working out together."

175.     As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to her economic and non-economic damage in an amount according to proof.

176.     DEFENDANTS acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFF and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## NINTH CAUSE OF ACTION
DISCRIMINATION TITLE VII AND FEHA
(Against Defendant Employer)

177.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

178.    DEFENDANTS and each of them discriminated against PLAINTIFFS by discriminating against Ms. Denton on basis of her gender. As a result of DEFENDANTS' discriminatory and disparate treatment of Ms. Denton, DEFENDANTS discriminated against the male PLAINTIFFS herein because of their association with Ms. Denton. This discrimination, both direct against Ms. Denton and indirect association discrimination towards male PLAINTIFFS violate Title VII and Fair Employment and Housing Act.

179.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

180.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure,

constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### TENTH CAUSE OF ACTION
DISCRIMINATION, FAILURE TO PROTECT FROM DISCRIMINATION IN VIOLATION OF TITLE VII AND FEHA
(Against Defendant Employer)

181.   PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

182.   DEFENDANTS have an obligation as employers to protect PLAINTIFFS and similarly situated employees from discrimination, including a hostile work environment in the workplace. DEFENDANTS and each of them breached this legally imposed obligation under federal and state laws and therefore are liable to PLAINTIFFS for all of the injuries, damages, and harm.

183.   As a direct and legal result of DEFENDANTS' illegal and retaliatory  conduct as set forth herein, PLAINTIFFS have suffered and continues to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

184.   DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure,

constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## ELEVENTH CAUSE OF ACTION
### CONVERSION
(Against Defendants Employer and Miliano)

185.   PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

186.   DEFENDANT MILIANO stole, took, converted, embezzled PLAINTIFFS' wages with the specific intent to keep and convert their wages for his own use and benefit. PLAINTIFFS did not consent to DEFENDANT MILIANO's illegal conversion of their earned wages.

187.   As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continues to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

188.   DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## TWELFTH CAUSE OF ACTION
### EMBEZZLEMENT
#### (Against Defendants Employer and Miliano)

189.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

190.    DEFENDANT MILIANO stole, took, converted embezzled PLAINTIFFS wages with the specific intent to keep and convert their wages for his own use and benefit. PLAINTIFFS did not consent to DEFENDANT MILIANO's illegal conversion of their earned wages.

191.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

192.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.


## THIRTEENTH CAUSE OF ACTION
### PREMISE LIABILITY
#### (Against Defendant Employer)

64
COMPLAINT

193.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

194.    DEFENDANTS negligently maintained, managed, controlled, and supervised their premises at the Lexus of Concord dealership by permitting a dangerous condition on its premises, to wit: An angry, out of control, abusive and dangerous manager. DEFENDANTS unreasonably failed to train, manage, and supervise DEFENDANT MILIANO in the proper and humane manner in which he should supervise employees. DEFENDANTS, and each of them, breached this legally imposed duty.

195.    As a direct and legal result of DEFENDANTS' illegal and retaliatory  conduct as set forth herein, PLAINTIFFS have suffered and continues to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

196.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### FOURTEENTH CAUSE OF ACTION
BREACH OF IMPLIED CONTRACT
(Against Defendant Employer)

197.     PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

198.     DEFENDANTS breached the implied at law contract that DEFENDANTS would obey all laws, federal and state, with respect to paying the wages earned, due, and owing to its employees. Further, DEFENDANTS breached their implied at law duty to terminate or discipline employees only for good cause. DEFENDANTS breached implied-in-law contracts with PLAINTIFFS by converting and embezzling employees' wages, by wrongfully terminating PLAINTIFFS because they engaged in protected activity, and by retaliating against PLAINTIFFS.

199.     As a direct and legal result of DEFENDANTS' illegal and retaliatory  conduct as set forth herein, PLAINTIFFS have suffered and continues to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

200.     DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

**FIFTEENTH CAUSE OF ACTION**
BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

66
COMPLAINT

(Against Defendant Employer)

201.   PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

202.   DEFENDANTS breached the covenant of good faith and fair dealing which the law imposes in every contract, requiring parties to engage in good faith and fair dealing so as to permit parties to a contract to enjoy the benefits of the bargain. DEFENDANTS engaged in bad faith and unfair dealing by violating state and federal laws with respect to failing to paying the wages earned, due, and owing to their PLAINTIFFS and other similarly situated employees. Further, DEFENDANTS breached the covenant of good faith and fair dealing by disciplining and terminating PLAINTIFFS and other similarly situated employees without good cause. Further, DEFENDANTS breached the covenant of good faith and fair dealing with PLAINTIFFS by converting and embezzling PLAINTIFFS' wages, and other similarly situated employees' wages, and by wrongfully terminating PLAINTIFFS because they engaged in protected activity, and by retaliating against PLAINTIFFS.

203.   As a direct and legal result of DEFENDANTS' illegal and retaliatory  conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

204.   DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious

disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### SIXTEENTH CAUSE OF ACTION
CONSTRUCTIVE TRUST/FIDUCIARY DUTY
(Against Defendants Employer and Miliano)

205.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

206.    DEFENDANT MILIANO received PLAINTIFFS' and other similarly situated employees' earned Spiff wages in trust for these employees. DEFENDANT MILIANO had a fiduciary duty to protect the Spiff wages after he took possession of those wages in trust for the employees.  DEFENDANT MILIANO breached this constructive trust and his fiduciary duty owing to PLAINTIFFS and other similarly situated employees, by stealing, converting, and embezzling the employees' wages which he held in a constructive trust for their benefit. Further, DEFENDANT MILIANO was a managing agent of DEFENDANT LEXUS OF CONCORD, rendering DEFENDANT LEXUS OF CONCORD vicariously liable as respondent superior for the breach of the constructive trust, resulting in the loss of the PLAINTIFFS' and similarly situated employees' wages.

207.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits,

68
COMPLAINT

cost of suit, embarrassment and anguish, all to her economic and non-economic damage in an amount according to proof.

208.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

**SEVENTEENTH CAUSE OF ACTION**
NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING
(Against Defendant Employer)

209.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

210.    DEFENDANTS negligently hired, retained, managed, controlled, supervised, and trained their managers. But for this negligent hiring, retaining, managing, controlling, supervising and training, the PLAINTIFFS and similarly situated employees would have not been subjected the illegal conduct described and alleged herein. DEFENDANTS unreasonably failed to train, manage, and supervise DEFENDANT MILIANO in the proper and humane manner in which he should supervise employees. DEFENDANTS, and each of them, breached this legally imposed duty.

211.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other

69
COMPLAINT

employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

212.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below

**EIGHTEENTH CAUSE OF ACTION**
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against Defendants Employer and Miliano)

213.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

214.    DEFENDANTS' conduct as alleged herein was intentional, extreme and outrageous and should not be tolerated in a civilized society such as ours. DEFENDANTS' conduct of intentionally converting PLAINTIFFS' and similarly situated employees' wages and subjecting PLAINTIFFS to an abusive, hostile work environment and terminating PLAINTIFFS because they engaged in protected activity is extreme and outrageous conduct which directly caused harm to PLAINTIFFS.

215.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other

employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

216.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### NINETEENTH CAUSE OF ACTION
BUSINESS PROFESSIONS CODE §§17200-17203
(Against Defendant Employer)

217.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

218.    DEFENDANTS violated California Business and Professions Code §§17200-17203 by engaging in unlawful, unfair, fraudulent business act practices, including the fraudulent Spiff Voucher Scheme, maintaining a pervasive Hostile Work Environment, and a pattern and practice of retaliation against PLAINTIFFS, and similarly situated employees. PLAINTIFFS hereby request an injunction against DEFENDANTS' unlawful schemes, and practices, including the fraudulent Spiff Voucher Scheme, to protect the employees and the public from such unfair business practices.

219.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings,

significant loss of reputation and professional injury, loss of promotional opportunities and other

employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits,

cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an

amount according to proof.

220.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable,

oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause

them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious

disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure,

constituting oppression, fraud, and malice under California Civil Code §3294, entitling

PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### TWENTIETH CAUSE OF ACTION
CONSPIRACY
(Against Defendants Miliano and James)

221.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint

as though set forth here in full.

222.    DEFENDANT MILIANO and DEFENDANT JAMES agreed, conspired, and took overt

acts to commit an unlawful purpose, including, but not limited to, the conversion and theft of

PLAINTIFFS' and similarly situated employees' wages. DEFENDANTS MILIANO AND

DEFENDANT JAMES further conspired to cover up and conceal the illegal conduct of

converting PLAINTIFFS' wages. This conspiracy resulted in unjust enrichment of

DEFENDANTS MILIANO and DEFENDANT JAMES. By DEFENDANT MILIANO'S own

description, he was "In with Greg", and they not only socialized at work, but also privately.

72
COMPLAINT

223.     As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

224.     DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## TWENTY-FIRST CAUSE OF ACTION
Labor Code §201, §221, §223, §226, §218.5
(Against Defendant Employer)

225.     PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

226.     DEFENDANTS' conduct of failing to pay the employees' Spiff wages violated Labor Code §221, providing that it is unlawful for an employer to collect or receive from an employee any part of the wages already paid to that employee; Labor Code §223 making it "unlawful to pay less than any contract or statute requires, while purporting to pay the required wage; Labor Code §226 providing that employers must provide an itemized breakdown each time the employer makes deductions from an employee's paycheck;  Labor Code §201 mandating that "If

73
COMPLAINT

an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately; and Labor Code §218.5 (a): "In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions the court shall award reasonable attorney's fees and costs."

227.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## TWENTY-SECOND CAUSE OF ACTION
### CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY
(Against All Defendants)

228.    PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

229.    Title VII, the 1964 Civil Rights Act, as amended, and the Fair employment and Housing Act prohibit discrimination, including hostile work environment and retaliation based on protected classifications in the workplace as a matter of public policy.

230.    DEFENDANTS LEXUS OF CONCORD, JAMES and MILIANO violated Title VII and FEHA, and the public policies embodied therein by willfully and actively and pervasively engaging in discriminatory and retaliatory conduct, creating an intolerable and hostile work environment.

231.   DEFENDANTS MILIANO and JAMES engaged in such continuous abusive and humiliating conduct, including racist and violent remarks directed towards Mr. Woo, Mr. Montoya, and Mr. Ubaldo, Asians, Latinos, African-Americans and other racial minorities, as well as women, that Mr. Woo, Mr. Montoya and Mr. Ubaldo finally were compelled and did quit their jobs.   Any reasonable salesperson of Asian, Latino or African-American descent would have felt compelled to extricate him-or herself from the abusive and hostile work environment by quitting.

232.   As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

233.   DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## TWENTY-THIRD CAUSE OF ACTION
LOSS OF CONSORTIUM
(Against Defendant Employer)

234.   PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

235.   DEFENDANTS' conduct directly caused PLAINTIFFS' spouses to suffer the loss of companionship, solace, comfort, joy, and healthy experience of marital life, including all of the duties encompassing marriage as well as financial support.

236.   As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to her economic and non-economic damage in an amount according to proof.

237.   DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

### TWENTY-FOURTH CAUSE OF ACTION
INJUNCTIVE RELIEF
(Against Defendant Employer)

238.   PLAINTIFFS incorporate by reference herein the preceding paragraphs of the complaint as though set forth here in full.

239.   DEFENDANTS' conduct as alleged herein is in violation of federal and state law and must be enjoined to prevent future injuries, damages, and harm, including loss earned wages.

76
COMPLAINT

PLAINTIFFS request a permanent injunction prohibiting DEFENDANTS from engaging in the illegal conduct alleged herein.

240.    As a direct and legal result of DEFENDANTS' illegal and retaliatory conduct as set forth herein, PLAINTIFFS have suffered and continue to suffer substantial losses in earnings, significant loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, embarrassment and anguish, all to their economic and non-economic damage in an amount according to proof.

241.    DEFENDANTS' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure PLAINTIFFS and to cause them mental anguish, anxiety, and distress. DEFENDANTS' acts were done in conscious disregard of the risk of severe emotional harm to PLAINTIFFS and with the intent to injure, constituting oppression, fraud, and malice under California Civil Code §3294, entitling PLAINTIFFS to punitive damages against DEFENDANTS.

Wherefore, Plaintiffs pray for judgment as more fully set forth below.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, and each of them as follows:

1. For general damages in an amount according to proof;

2. For special damages in an amount according to proof;

3. For prejudgment interest in an amount according to proof;

4. For reasonable attorney's fees and cost of suit therein;

5. For punitive damages in the amount of $7,000,000.00 as to each Defendant;

6. For statutory penalties and any other statutory relief;

77

COMPLAINT

7. For $3,000,000.00 in compensatory damages per Plaintiff, including physical injuries

creating mental and emotional misery

8. For such other and further relief as the court may deem proper.

9. Plaintiffs hereby demand a trial by jury.

DATED: April 24, 2014

LAW OFFICES OF BONNER AND BONNER

By:*/s/ Charles A. Bonner*
CHARLES A.  BONNER
ATTORNEY FOR PLAINTIFFS

LAW OFFICES OF KARAN K.GILL

By: */s/ Karan K. Gill*
KARAN K. GILL
ATTORNEY FOR PLAINTIFFS

**JURY TRIAL DEMANDED**

DATED: APRIL 24, 2014

LAW OFFICES OF BONNER AND BONNER

By:*/s/ CHARLES A. BONNER*
CHARLES A. BONNER
ATTORNEY FOR PLAINTIFFS

LAW OFFICES OF KARAN K. GILL

By:*/s/ KARAN K. GILL*
Karan K. Gill
ATTORNEY FOR PLAINTIFF

78
COMPLAINT